TONY WEST
Assistant Attorney General
JAMES J. GILLIGAN
Assistant Director
W. SCOTT SIMPSON
Senior Trial Counsel
Department of Justice
Civil Division, Room 7210
Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044
Telephone: (202) 514-3495
Fax: (202) 616-8470
E-mail: scott.simpson@usdoj.gov

ATTORNEYS FOR DEFENDANT
UNITED STATES OF AMERICA

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| ARTHUR SMELT and CHRISTOPHER HAMMER,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, STATE OF CALIFORNIA, and DOES 1 through 1,000,<br><br>Defendants. | CASE NO. SACV09-00286 DOC (MLGx)<br><br>**DEFENDANT UNITED STATES OF AMERICA'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: August 3, 2009<br>Time: 8:30 a.m. |

PLEASE TAKE NOTICE that on Monday, August 3, 2009, at 8:30 a.m., or as soon thereafter as counsel may be heard, the defendant United States of America, by its undersigned counsel, will move for dismissal of this action. The hearing will take place before United States District Judge David O. Carter, in Courtroom 9D of the Ronald Reagan Federal Building and U.S. Courthouse, 411 West Fourth Street, Santa Ana, California.

The defendant United States of America will move to dismiss all of plaintiffs' claims against the federal Defense of Marriage Act, under Rule 12 of the Federal Rules of Civil Procedure, on the

grounds that this Court lacks jurisdiction over plaintiffs' claims against the United States, given that the State court from which this action was removed lacked such jurisdiction; that plaintiffs lack standing to assert their claims against the United States; and that plaintiffs have failed to state a claim on which relief can be granted.

The motion of the United States will be based on this Notice, the following Memorandum of Points and Authorities, the pleadings and files in this action, such matters of which the Court may take judicial notice, and such oral argument as may take place at the time of the hearing.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on June 4, 2009.

Dated: June 11, 2009

Respectfully submitted,

TONY WEST
Assistant Attorney General

JAMES J. GILLIGAN
Assistant Director

/s/ W. Scott Simpson
_______________________________
W. SCOTT SIMPSON
Senior Trial Counsel

Attorneys, Department of Justice
Federal Programs Branch
Civil Division, Room 7210
Post Office Box 883
Washington, D.C. 20044
Telephone: (202) 514-3495
Fax: (202) 616-8470
E-mail: scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANT
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNITED STATES OF AMERICA'S MOTION TO DISMISS**

TABLE OF CONTENTS


INTRODUCTION . . . . . . . . . . 1

STATUTORY BACKGROUND . . . . . . . . . . 5

PROCEDURAL HISTORY . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . 9

I. This Court Lacks Jurisdiction Over Plaintiffs' Claims Against the United States Because the State Court Lacked Jurisdiction . . . . . . . . . . 9

II. Plaintiffs' Claims and Allegations Against the United States Must Be Dismissed for Lack of Standing . . . . . . . . . . 10

A. The Case or Controversy Requirement of Article III . . . . . . . . . . 11

B. Plaintiffs Lack Standing to Challenge DOMA's Reservation of the States' Authority Regarding Recognition of Same-Sex Marriages Performed in Other States . . . . . . . . . . 12

C. Plaintiffs Lack Standing to Challenge the Definitions of "Marriage" and "Spouse" Under Federal Law . . . . . . . . . . 13

D. Plaintiffs Cannot Establish Standing to Seek Certain Sweeping Relief Requested in Their Complaint . . . . . . . . . . 14

III. DOMA Is a Valid Exercise of Congress's Power under the Full Faith and Credit Clause . . . . . . . . . . 16

A. Section 2 is Consistent With Common Law Conflicts Principles . . . . . . . . . . 16

B. Section 2 Was Enacted Under Congress's Authority to Prescribe the "Effect" of One State's Acts in Other States . . . . . . . . . . 19

IV. DOMA Cannot Be Said to Violate an Asserted "Right to Travel" . . . . . . . . . . 21

V. DOMA Is Consistent with Equal Protection and Due Process Principles . . . . . . . . . . 22

A. Federal Courts Have Unanimously Upheld the Constitutionality of DOMA . . . . . . . . . . 23

B. DOMA Does Not Impinge Upon Rights That Have Been Recognized as Fundamental . . . . . 25

C. DOMA Does Not Rest on a Suspect Classification . . . . . 30

D. DOMA Satisfies Rational-Basis Review . . . . . 32

VI. DOMA Does Not Violate the Right to Privacy . . . . . 37

VII. DOMA Cannot Be Said to Infringe Upon any Rights of Speech . . . . . 39

VIII. DOMA Cannot Be Said to Infringe Upon any "Right" under the Ninth Amendment . . . . . 41

CONCLUSION . . . . . 42

TABLE OF AUTHORITIES


CONSTITUTION page(s)

U.S. Const. art. III, § 2 . . . . . 11

U.S. Const. art. IV, § 1, cl. 2 . . . . . 19

CASES

Adams v. Howerton, 673 F.2d 1036 (9th Cir. 1982) . . . . . 24,30

Agostini v. Felton, 521 U.S. 203, 117 S. Ct. 1997, 138 L.Ed.2d 391 (1997) . . . . . 30

Alaska Packers Ass'n v. Industrial Accident Comm'n, 294 U.S. 532, 55 S. Ct. 518, 79 L. Ed. 1044 (1935) . . . . . 17,22

Aleman v. Glickman, 217 F.3d 1191 (9th Cir. 2000) . . . . . 36

Allen v. Wright, 468 U.S. 737, 104 S. Ct. 3315, 82 L.Ed.2d 556 (1984) . . . . . 12

Arcara v. Cloud Books, Inc., 478 U.S. 697, 106 S. Ct. 3172, 92 L.Ed.2d 568 (1986) . . . . . 40

Artichoke Joe's Cal. Grand Casino v. Norton, 353 F.3d 712 (9th Cir. 2003) . . . . . 35

Baehr v. Lewin, 852 P.2d 44 (Haw. 1993) . . . . . 5,24

Baker v. Nelson, 191 N.W.2d 185 (Minn. 1971), appeal dismissed, 409 U.S. 810, 93 S. Ct. 37, 34 L.Ed.2d 65 (1972) (mem) . . . . . 24,29,32,37

Baker v. Nelson, 409 U.S. 810, 93 S. Ct. 37, 34 L.Ed.2d 65 (1972) (mem) . . . . . 28,29,38

Baker v. Vermont, 744 A.2d 864 (Vt. 1999) . . . . . 32

Bank of Augusta v. Earle, 38 U.S. (13 Pet.) 519, 10 L. Ed. 274 (1839) . . . . . 17

Barefoot v. City of Wilmington, 306 F.3d 113, 123 (4th Cir. 2002) . . . . . 35

Bigelow v. Virginia, 421 U.S. 809, 95 S. Ct. 2222, 44 L.Ed.2d 600 (1975) . . . . . 11

Bishop v. Oklahoma, 447 F. Supp. 2d 1239 (N.D. Okla. 2006) . . . . . 24

Brown v. Hot, Sexy and Safer Productions, Inc., 68 F.3d 525 (1st Cir. 1995) . . . . . 38

Butler v. Apfel, 144 F.3d 622 (9th Cir.1998) . . . . . 34,36

Califano v. Gautier Torres, 435 U.S. 1, 98 S. Ct. 906, 55 L.Ed.2d 65 (1978) . . . . . 23

Catalano v. Catalano, 170 A.2d 726 (Conn. 1961) . . . . . 18

Church of Amer. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197 (2d Cir. 2004) . . . . . 40

Citizens for Equal Protection v. Bruning, 455 F.3d 859 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 23

Dean v. District of Columbia, 653 A.2d 307, 331-33, 362-64 (D.C. 1995) . . . . . . . . . . . . . . . . 24,32

DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 109 S. Ct. 998, 103 L.Ed.2d 249 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Dittman v. California, 191 F.3d 1020 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Duke Power Co. v. Carolina Envt'l Study Group, Inc., 438 U.S. 59, 98 S. Ct. 2620, 57 L.Ed.2d 595 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 124 S. Ct. 2301, 2309, 159 L.Ed.2d 98 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,15

In re Elko County Grand Jury, 109 F.3d 554 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Ellis v. Anderson, 901 S.W. 2d 46, 47-48 (Ky. Ct. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

FBI v. Superior Court of Cal., 507 F. Supp. 2d 1082 (N.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . 9

FCC v. Beach Communications, Inc., 508 U.S. 307, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Froehlich v. Wisconsin Dep't of Corrections, 196 F.3d 800 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . 42

FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 110 S. Ct. 596, 107 L.Ed.2d 603 (1990) . . . . . . . . 12

Glass v. National R.R. Passenger Corp., 570 F. Supp. 2d 1180 (C.D. Cal. 2008) . . . . . . . . . . . . 9,10

Goodridge v. Dep't of Pub. Health, 798 N.E.2d 941 (Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Griswold v. Connecticut, 381 U.S. 479, 85 S. Ct. 1678, 14 L.Ed.2d 510 (1965) . . . . . . . . . . . . . . . 37

Grummett v. Rushen, 779 F.2d 491 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Harris v. McRae, 448 U.S. 297, 100 S. Ct. 2671, 65 L.Ed.2d 784 (1980) . . . . . . . . . . . . . . . . . . . . 28

Hassan v. Wright, 45 F.3d 1063 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Heller v. Doe, 509 U.S. 312, 113 S. Ct. 2637, 125 L.Ed.2d 257 (1993) . . . . . . . . . . . . . . . . . . . 32,33

Hicks v. Miranda, 422 U.S. 332, 343-44, 95 S. Ct. 2281, 45 L.Ed.2d 223 (1975) . . . . . . . . . . . 29,38

High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563 (9th Cir. 1990) . . . . . . . . 31

Hilton v. Guyot, 159 U.S. 113, 16 S. Ct. 139, 40 L. Ed. 95 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . 17

Hong Kong Supermarket v. Kizer, 830 F.2d 1078 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 15

James v. City of Long Beach, 18 F. Supp. 2d 1078 (C.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . . 39,40

Jenkins v. Commissioner, 483 F.3d 90 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Kahawaiolaa v. Norton, 386 F.3d 1271 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

In re Kandu, 315 B.R. 123 (Bankr. W. D. Wash. 2004), appeal dismissed Kandu v. United States Trustee, Case No. 3:04-cv-05544-FDB (W.D. Wash.) . . . . . 24,31,32,36,38

Kerrigan v. Comm'r of Pub. Health, 957 A.2d 407 (Conn. 2008) . . . . . 1

Lavine v. Milne, 424 U.S. 577, 96 S. Ct. 1010, 47 L.Ed.2d 249 (1976) . . . . . 27

Lawrence v. Texas, 539 U.S. 558, 123 S. Ct. 2472, 156 L.Ed.2d 508 (2003) . . . . . 25,38,39

Lofton v. Secretary of Dep't of Children & Family Servs., 358 F.3d 804 (11th Cir. 2004) . . . . . 23

Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) . . . . . 32

Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992) . . . . . 11

Lyng v. Automobile Workers, 485 U.S. 360, 108 S. Ct. 1184, 99 L.Ed.2d 380 (1987) . . . . . 28

Medeiros v. Vincent, 431 F.3d 25 (1st Cir. 2005) . . . . . 34

Mandel v. Bradley, 432 U.S. 173, 97 S. Ct. 2238, 53 L.Ed.2d 199 (1977) . . . . . 30

Massachusetts v. EPA, 549 U.S. 497, 127 S. Ct. 1438, 167 L.Ed.2d 248 (2007) . . . . . 34

McConnell v. Nooner, 547 F.2d 54, 56 (8th Cir. 1976) . . . . . 30

McElmoyle ex rel. Bailey v. Cohen, 38 U.S. (13 Pet.) 312, 10 L. Ed. 177 (1839) . . . . . 19,20

Miller v. Stauffer Chem. Co., 581 P.2d 345 (Idaho 1978) . . . . . 22

Mills v. Duryee, 11 U.S. (7 Cranch) 481, 3 L. Ed. 411 (1813) . . . . . 20

Mixon v. Ohio, 193 F.3d 389 (6th Cir. 1999) . . . . . 35

Moore v. Detroit School Reform Bd., 293 F.3d 352 (6th Cir 2002) . . . . . 35

In re Mortenson's Estate, 316 P.2d 1106 (Ariz. 1957) . . . . . 18

Morton v. Mancari, 417 U.S. 535, 94 S. Ct. 2474, 41 L.Ed.2d 290 (1974) . . . . . 35

National Ass'n for Advancement of Psychoanalysis v. California Bd. of Psychology, 228 F.3d 1043 (9th Cir. 2000) . . . . . 22,26

Nebraska v. Bentson, 146 F.3d 676 (9th Cir. 1998) . . . . . 10

Nevada v. Hall, 440 U.S. 410, 99 S. Ct. 1182, 59 L.Ed.2d 416 (1979) . . . . . 17,22

Newbury v. Prisoner Review Bd., 791 F.2d 81 (7th Cir. 1986) . . . . . 36

New State Ice Co. v. Liebmann, 285 U.S. 262, 52 S. Ct. 371, 76 L.Ed. 747 (1932) . . . . . 1

Nordyke v. King, 319 F.3d 1185 (9th Cir. 2003) . . . . . 40

Pacific Employers Ins. Co. v. Industrial Accident Comm'n, 306 U.S. 493, 59 S. Ct. 629, 83 L. Ed. 940 (1939) . . . . . 17

Palmer v. City Nat'l Bank, 498 F.3d 236 (4th Cir. 2007) . . . . . 9

Paul v. Davis, 424 U.S. 693, 96 S. Ct. 1155, 47 L.Ed.2d 405 (1976) . . . . . 38

Personnel Adm'r v. Feeney, 442 U.S. 256, 99 S. Ct. 2282, 60 L.Ed.2d 870 (1979) . . . . . 32

Powelson v. United States, 150 F.3d 1103 (9th Cir. 1998) . . . . . 10

Raines v. Byrd, 521 U.S. 811, 117 S. Ct. 2312, 138 L.Ed.2d 849 (1997) . . . . . 11

Reno v. Flores, 507 U.S. 292, 113 S. Ct. 1439, 123 L.Ed.2d 1 (1993). . . . . . 26

Richardson v. City & County of Honolulu, 124 F.3d 1150 (9th Cir. 1997) . . . . . 25

Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S. Ct. 1917, 104 L.Ed.2d 526 (1989) . . . . . 30

Roe v. Wade, 410 U.S. 113, 93 S. Ct. 705, 35 L.Ed.2d 147 (1973) . . . . . 38

Romer v. Evans, 517 U.S. 620, 116 S. Ct. 1620, 134 L.Ed.2d 855 (1996) . . . . . 24,25

Roulette v. City of Seattle, 97 F.3d 300 (9th Cir. 1996) . . . . . 40,41

Rumsfeld v. Forum for Academic & Inst'l Rights, 547 U.S. 47, 126 S. Ct. 1297, 164 L.Ed.2d 156 (2006) . . . . . 39,40

Rust v. Sullivan, 500 U.S. 173, 111 S. Ct. 1759, 114 L.Ed.2d 233 (1991) . . . . . 28

Saenz v. Roe, 526 U.S. 489, 119 S. Ct. 1518, 143 L.Ed.2d 689 (1999) . . . . . 21

Salveson v. Western States Bankcard Ass'n, 731 F.2d 1423 (9th Cir. 1984) . . . . . 9

Samuels v. New York State Dep't of Health, 811 N.Y.S.2d 136, 146-47 (N.Y. App. Div. 2006)

San Diego County Gun Rights Comm. v. Reno, 98 F.3d 1121 (9th Cir. 1996) . . . . . 41

Schowengerdt v. United States, 944 F.2d 483 (9th Cir. 1991) . . . . . 41

SEC v. Chenery Corp., 332 U.S. 194, 67 S. Ct. 1575, 91 L.Ed. 1995 (1947) . . . . . 34

Shapiro v. Thompson, 394 U.S. 618, 89 S. Ct. 1322, 22 L.Ed.2d 600 (1969) . . . . . 21

Shaw v. Oregon Public Employees' Retirement Bd., 887 F.2d 947 (9th Cir. 1989) . . . . . 33

Shields v. Burge, 874 F.2d 1201 (7th Cir. 1989) . . . . . 38

Singer v. Hara, 522 P.2d 1187 (Wash. Ct. App. 1974) . . . . . 32

Smelt v. County of Orange, 374 F. Supp. 2d 861 (C.D. Cal. 2005) . . . . . 7,11,13,24,41

Smelt v. County of Orange, 447 F.3d 673 (9th Cir. 2006) . . . . . 7,8,11,14,41

Squaw Valley Dev. Co. v. Goldberg, 375 F.3d 936 (9th Cir. 2004) . . . . . 25

Standhardt v. Superior Court, 77 P.3d 451 (Ariz. Ct. App. 2003) . . . . . 24

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 118 S. Ct. 1003, 140 L.Ed.2d 210 (1998) . . . . . . 11,14

Strandberg v. City of Helena, 791 F.2d 744 (9th Cir. 1986) . . . . . . 42

Strauss v. Horton, 207 P.3d 48 (Cal. May 26, 2009) . . . . . . 8

Sun Oil Co. v. Wortman, 486 U.S. 717, 108 S. Ct. 2117, 100 L.Ed.2d 743 (1988) . . . . . . 17,18,20

Texas v. Johnson, 491 U.S. 397, 109 S. Ct. 2533, 105 L.Ed.2d 342 (1989) . . . . . . 40

United States v. Choate, 576 F.2d 165 (9th Cir. 1978) . . . . . . 42

United States v. Deters, 143 F.3d 577 (10th Cir. 1998) . . . . . . 26

United States v. Hays, 515 U.S. 737, 115 S. Ct. 2431, 132 L.Ed.2d 635 (1995) . . . . . . 15

United States R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 101 S. Ct. 453, 66 L.Ed.2d 368 (1980) . . . . . . 36

Varnum v. Brien, 763 N.W.2d 862 (Iowa 2009) . . . . . . 1

Villegas v. City of Gilroy, 363 F. Supp. 2d 1207 (N.D. Cal. 2005) . . . . . . 40,41

Warth v. Seldin, 422 U.S. 490, 95 S. Ct. 2197, 45 L.Ed.2d 343 (1975) . . . . . . 12

Washington v. Glucksberg, 521 U.S. 702, 117 S. Ct. 2258, 138 L.Ed.2d 772 (1997) . . . . . . 26,32,36

Webster v. Reproductive Health Servs., 492 U.S. 490, 109 S. Ct. 3040, 106 L.Ed.2d 410 (1989) . . . . . . 28

Whitmore v. Arkansas, 495 U.S. 149, 110 S. Ct. 1717, 109 L.Ed.2d 135 (1990) . . . . . . 11,21

Wilkins v. Zelichowski, 140 A.2d 65 (N.J. 1958) . . . . . . 18

Williams v. Attorney Gen. of Ala., 378 F.3d 1232 (11th Cir. 2004) . . . . . . 26

Williams v. North Carolina, 317 U.S. 287, 63 S. Ct. 207, 87 L. Ed. 279 (1942) . . . . . . 17

Willis v. Town of Marshall, N.C., 426 F.3d 251 (4th Cir. 2005) . . . . . . 40

Wilson v. Ake, 354 F. Supp. 2d 1298 (M.D. Fla. 2005) . . . . . . 24,30,31,38

Yorkshire v. IRS, 829 F. Supp. 1198 (C.D. Cal. 1993) . . . . . . 38

Zablocki v. Redhail, 434 U.S. 374, 98 S. Ct. 673, 54 L.Ed.2d 618 (1978) . . . . . . 28

STATUTES AND LEGISLATIVE HISTORY

1 U.S.C. § 7 . . . . . . 5,23

28 U.S.C. § 1257(2) (repealed 1988) . . . . . . 29

28 U.S.C. § 1441 . . . . . . 9

28 U.S.C. § 1442 . . . . . . . . . . 9

28 U.S.C. § 1442(a)(1) . . . . . . . . . . 9

28 U.S.C. § 1738C . . . . . . . . . . 5,7,13,23

Defense of Marriage Act, Pub. L. No. 104-199, 110 Stat. 2419 (1996) . . . . . . . . . . 5

LD 1020, An Act To End Discrimination in Civil Marriage & Affirm Religious Freedom, 2009 Me. Legis. Serv. ch. 82 (West) . . . . . . . . . . 1

HB 436, An Act Relative to Civil Marriage & Civil Unions, 2009 N.H. Laws ch. 59 . . . . . . . . . . 1

S. 115, An Act to Protect Religious Freedom & Recognize Equality in Civil Marriage, 2009 Vt. Acts & Resolves no. 3 . . . . . . . . . . 1

H.R. Rep. No. 104-664, <u>reprinted in</u> 1996 U.S.C.C.A.N. 2905 . . . . . . . . . . 5-7,25,34,35,37

REGULATIONS AND OTHER ADMINISTRATIVE MATERIALS

13 C.F.R. § 127.303(b)(3) . . . . . . . . . . 31

31 C.F.R. § 0.214(a) . . . . . . . . . . 31

Exec. Order No. 11,478, 34 Fed. Reg. 12,985 (Aug. 8, 1969), <u>reprinted as amended in</u> 42 U.S.C.A. § 2000e note . . . . . . . . . . 31

Exec. Order No. 13,160, 65 Fed. Reg. 39,773 (June 23, 2000), <u>reprinted in</u> 42 U.S.C. § 2000d note . . . . . . . . . . 31

The White House, Office of Communications, President on Signing Same Gender Marriage Ban, 1996 WL 533626 (Sept. 22, 1996) . . . . . . . . . . 35

OTHER AUTHORITIES

The Federalist No. 42 (James Madison) (Clinton Rossiter ed., 1961) . . . . . . . . . . 19

Restatement (First) of Conflict of Laws § 134 . . . . . . . . . . 18

Restatement (Second) of Conflict of Laws § 284 . . . . . . . . . . 18

INTRODUCTION

In recent years, several States have guaranteed gay and lesbian couples the freedom to marry as a basic civil right. See HB 436, An Act Relative to Civil Marriage & Civil Unions, 2009 N.H. Laws ch. 59; LD 1020, An Act To End Discrimination in Civil Marriage & Affirm Religious Freedom, 2009 Me. Legis. Serv. ch. 82 (West); S. 115, An Act to Protect Religious Freedom & Recognize Equality in Civil Marriage, 2009 Vt. Acts & Resolves no. 3; Varnum v. Brien, 763 N.W.2d 862 (Iowa 2009); Kerrigan v. Comm'r of Pub. Health, 957 A.2d 407 (Conn. 2008); Goodridge v. Dep't of Pub. Health, 798 N.E.2d 941 (Mass. 2003). Yet, as same-sex couples in these States have won what they understandably view as a vital personal right of surpassing importance to their happiness and well-being, other States have reaffirmed the traditional understanding of marriage as the union of a man and a woman as husband and wife, see Varnum, 763 N.W.2d at 878 n.5 — an understanding held as a matter of profound moral and religious conviction by many of their citizens.

This case does not call upon the Court to pass judgment, however, on the legal or moral right of same-sex couples, such as plaintiffs here, to be married. Plaintiffs are married, and their challenge to the federal Defense of Marriage Act ("DOMA") poses a different set of questions: whether by virtue of their marital status they are constitutionally entitled to acknowledgment of their union by States that do not recognize same-sex marriage, and whether they are similarly entitled to certain federal benefits. Under the law binding on this Court, the answer to these questions must be no.

DOMA reflects a cautiously limited response to society's still-evolving understanding of the institution of marriage. Congress passed DOMA in 1996, at a time when States and their citizens were just beginning to address the legal status of same-sex marriage. Consistent with our federalist system, which allows each State to "serve as a laboratory[,] and try novel social and economic experiments without risk to the rest of the country," New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S. Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting), DOMA does not address whether a same-sex couple may marry within the United States. Instead, it permits the citizens of each State to decide that question for themselves. To preserve the autonomy of the States in this area,

therefore, Section 2 of DOMA provides that each State may decide whether to recognize a same-sex marriage performed under the law of another State.

Section 3, in turn, addresses the effects of new State definitions of marriage on federal programs that tie entitlement to certain benefits to married status. Congress had long conferred various financial and other benefits on the basis of marriage in light of the central role the institution has played in advancing a variety of societal interests. When States began to consider adopting historically novel forms of marriage, Congress took a wait-and-see approach. It codified, for purposes of federal benefits, a definition of marriage that all fifty states had adopted (i.e., that between a man and a woman) and continued to accord financial and other benefits on the basis of that historical definition. At the same time, it cautiously declined to extend federal benefits on the basis of a newer definition of marriage that no States had adopted at the time of DOMA's passage (and only a very small minority of States have since). Thus, by defining "marriage" and "spouse" as the legal union of a man and a woman and affording federal benefits on that basis, Section 3 of DOMA simply maintained the status quo: it continues the longstanding federal policy of affording federal benefits and privileges on the basis of a centuries-old form of marriage, without committing the federal government to devote scarce resources to newer versions of the institution that any State may choose to recognize.

The plaintiffs in this case, a same-sex couple married under the laws of California, make a number of claims against DOMA. Specifically, they allege that Section 2 violates the Full Faith and Credit Clause and their "right to travel," that both sections of DOMA violate the Due Process Clause of the Fifth Amendment (including its equal protection component) and their "right to privacy," and that Section 3 violates their "right of free speech" and their "rights" under the Ninth Amendment. Plaintiffs initially filed this action in State court, and the defendant United States removed it to this Court.

Rather than reaching the merits of these claims, the Court should dismiss this action for lack of subject matter jurisdiction, for two reasons. First, a federal court has no more jurisdiction in a removed case than did the State court before removal, and the United States was immune from suit

on plaintiffs' claims in State court. All claims against the United States should be dismissed on that basis alone. Second, even in absence of that principle, plaintiffs lack standing to challenge either Section 2 or Section 3 of DOMA. Plaintiffs lack standing to challenge Section 2, because they nowhere allege that they have actually been denied any rights or benefits under the laws of another State resulting from the refusal of that State to acknowledge their marital status. They lack standing as well to challenge Section 3 of DOMA, because they do not allege that the federal definitions of "marriage" and "spouse" in Section 3 have ever been applied to them for purposes of any federal law. Plaintiffs fail to allege that they have ever applied for any federal benefits that are available on the basis of married status — let alone that they have been denied any as a result of DOMA. Because they have not been injured by Section 3's definitions, their challenge to this provision must be dismissed for lack of standing.

On the merits, plaintiffs' claims that DOMA violates the Full Faith and Credit Clause and their "right to travel" both fail as a matter of law. In allowing each State to withhold its recognition of same-sex marriages performed in other jurisdictions, Congress was merely confirming longstanding conflict-of-laws principles in a valid exercise of its express power to settle such questions under the Full Faith and Credit Clause. That Clause ensures that each State retains the authority to decline to apply another State's law when it conflicts with its own public policies. DOMA is fully consistent with that constitutional principle, as it permits States to experiment with and maintain the exclusivity of their own legitimate public policies — such as whether that State chooses to recognize or reject same-sex marriages. Similarly, in relation to plaintiffs' purported "right to travel" claim, DOMA simply does not impinge upon anyone's ability to travel among the States. Again, it merely permits each State to follow its own policy with respect to marriage.

Plaintiffs' due process and equal protection claims also must be dismissed. Like all federal statutes, DOMA is entitled to a presumption of constitutionality. Because DOMA does not restrict any rights that have been recognized as fundamental or rely on any suspect classifications, it need not be reviewed with heightened scrutiny. Properly understood, the right at issue in this case is <u>not</u> a right to marry. After all, the federal government does not, either through DOMA or any other

federal statute, issue marriage licenses or determine the standards for who may or may not get married. Indeed, as noted above — and as evidenced by the fact that plaintiffs have married in California — DOMA in no way prohibits same-sex couples from marrying. Instead, the only right at issue in this case is a right to receive certain benefits on the basis of a same-sex marriage. No court has ever found such a right to federal benefits on that basis to be fundamental — in fact, all of the courts that have considered the question have rejected such a claim. (And even if the right at issue in this case were the right to same-sex marriage, current Supreme Court precedent that binds this Court does not recognize such a right under the Constitution.) Likewise, DOMA does not discriminate, or permit the States to discriminate, on the basis of a suspect classification; indeed, the Ninth Circuit has held that sexual orientation is not a suspect classification.

DOMA therefore must be analyzed under rational-basis review. Under the highly deferential rational basis standard, moreover, a court may not act as superlegislature, sitting in judgment on the wisdom or morality of a legislative policy. Instead, a legislative policy must be upheld so long as there is any reasonably conceivable set of facts that could provide a rational basis for it, including ones that the Congress itself did not advance or consider. DOMA satisfies this standard.

Individuals are born into, or form, a broad spectrum of human relationships, founded in kinship or affection, whether of spouses, siblings, parent and child, cousins, companions, partners, or otherwise. Yet of all these relationships, Congress has long extended certain federal benefits and protections on the basis of just one — that between a husband and wife (and their minor children). Congress is entitled under the Constitution to address issues of social reform on a piecemeal, or incremental, basis. It was therefore permitted to maintain the unique privileges it has afforded to this one relationship without immediately extending the same privileges, and scarce government resources, to new forms of marriage that States have only recently begun to recognize. Its cautious decision simply to maintain the federal status quo while preserving the ability of States to experiment with new definitions of marriage is entirely rational. Congress may subsequently decide to extend federal benefits to same-sex marriages, but its decision to reserve judgment on the question does not render any differences in the availability of federal benefits irrational or unconstitutional.

Finally, plaintiffs' other claims must be dismissed as well. First, DOMA does not impinge on plaintiffs' ability to express their views and therefore does not violate their First Amendment rights. In any event, marriage (whether same-sex or heterosexual) does not constitute expressive conduct under the First Amendment. Second, the right to privacy encompasses only rights that are constitutionally fundamental, and, as noted earlier, the right to receive benefits on the basis of same-sex marriage (as well as same-sex marriage itself) has not been recognized by the courts as a fundamental right. Third, plaintiffs cannot plead a claim under the Ninth Amendment because that provision is not an independent source of rights.

Accordingly, all of plaintiffs' claims against the United States in this action should be dismissed.

## STATUTORY BACKGROUND

In 1996, Congress enacted, and President Clinton signed into law, the Defense of Marriage Act, Pub. L. No. 104-199, 110 Stat. 2419 (1996). Section 2 of DOMA provides that "[n]o State . . . shall be required to give effect to any public act, record, or judicial proceeding of any other State . . . respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State." 28 U.S.C. § 1738C. Section 3 of DOMA defines the terms "marriage" and "spouse," for purposes of federal law, to include only the union of one man and one woman. Specifically, it provides that:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or wife.

1 U.S.C. § 7.

The House Judiciary Committee issued a report describing the background and purposes of DOMA. As the Committee explained, DOMA was enacted following the decision in Baehr v. Lewin, 852 P.2d 44 (Haw. 1993), in which a plurality of the Hawaii Supreme Court concluded that the definition of marriage under Hawaii law (as the union of one man and one woman) might warrant heightened scrutiny under the State constitution. See H.R. Rep. No. 104-664, at 2, reprinted

in 1996 U.S.C.C.A.N. 2905, 2906. In response, Congress sought both to "preserve[ ] each State's ability to decide" what should constitute a marriage under its own laws and to "lay[ ] down clear rules" regarding what constitutes a marriage for purposes of federal law. Id. In enacting Section 2 of DOMA, Congress relied on its "express grant of authority," under the second sentence of the Constitution's Full Faith and Credit Clause, "to prescribe the effect that public acts, records, and proceedings from one State shall have in sister States." Id. at 25, reprinted in 1996 U.S.C.C.A.N. at 2930. That provision, said the Committee, empowers Congress to "resolv[e] conflicts" between the enactments of the different States, id., and Section 2 of DOMA does so by preserving the power of the States to decline to give effect to the laws of other States respecting same-sex marriage.

The House Judiciary Committee went on to state that Section 3 of DOMA merely codifies, for purposes of federal law, the definition of marriage set forth in "the standard law dictionary." Id. at 29, reprinted in 1996 U.S.C.C.A.N. at 2935 (citing Black's Law Dictionary 972 (6th ed. 1990)). In explaining why Congress chose to limit federal marital benefits to opposite-sex couples, the Committee acknowledged that "[t]here are relations of deep, abiding love" between persons of all kinds, "brothers and sisters, parents and children, grandparents and grandchildren," that "cannot be diminished as loves [just] because they are not . . . expressed in marriage." Id. at 13, reprinted in 1996 U.S.C.C.A.N. at 2917 (internal quotation marks omitted). Nevertheless, the Committee stressed, DOMA grants "preferred legal status" to a particular kind of loving relationship — heterosexual marriage — based on four asserted government interests. Id. at 12, reprinted in 1996 U.S.C.C.A.N. at 2916. First, the Committee advanced an interest in "defending and nurturing the institution of traditional, heterosexual marriage" because of the role it plays in "procreation and child-rearing." Id. at 12, 15, reprinted in 1996 U.S.C.C.A.N. at 2916, 2919. Second, the Committee believed that DOMA furthered Congress's asserted interest in "traditional notions of morality." Id. at 15, reprinted in 1996 U.S.C.C.A.N. at 2919. Third, the Committee maintained that DOMA advances the government's interest in "protecting state sovereignty and democratic self-governance." Id. at 16, reprinted in 1996 U.S.C.C.A.N. at 2920. Fourth, the Committee explained that DOMA

advances the government's interest in "preserving scarce government resources." Id. at 18, reprinted in 1996 U.S.C.C.A.N. at 2922.

PROCEDURAL HISTORY

Plaintiffs first challenged DOMA in an action filed in this Court on September 1, 2004, Arthur Bruno Smelt, et al. v. County of Orange, California, et al., Case No. SACV04-1042 GLT (MLGx). In that action, they alleged that DOMA violated the Due Process Clause, principles of Equal Protection, and the Full Faith and Credit Clause. Ruling on cross-motions for summary judgment, this Court held that plaintiffs lacked standing to challenge Section 2 of DOMA. The Court's reasoning was two-fold: First, because plaintiffs were not married at the time under the law of any State, there was no "public act . . . respecting a relationship between persons of the same sex" to which the statute could apply. Smelt v. County of Orange, 374 F. Supp. 2d 861, 870-71 (C.D. Cal. 2005) [hereinafter Smelt I]; see 28 U.S.C. § 1738C. And second, since plaintiffs did not "claim to have plans to seek recognition of their eventual California marriage in another state," they had not established an "imminent injury" due to Section 2. 374 F. Supp. at 871. The Court then addressed the merits of Section 3 (the definitional section) and rejected all of plaintiffs' challenges, holding that Section 3 does not discriminate on the basis of a suspect classification, that it does not impinge upon a right held by the courts as fundamental, and that it is "rationally related to the legitimate government interest[s]" that Congress identified in enacting DOMA. 374 F. Supp. 2d at 880.

Plaintiffs appealed, and the Ninth Circuit held that they lacked standing to challenge either section of DOMA. Smelt v. County of Orange, 447 F.3d 673 (9th Cir. 2006) [hereinafter Smelt II]. As to Section 2, the court essentially agreed with this Court's rationale. See id. at 683. In relation to Section 3, the appellate court reasoned:

> DOMA itself simply does not injure [the plaintiffs] or exclude them from some undefined benefit to which they might have been or might someday be entitled. In fact, they do not suggest that they have applied for any federal benefits, much less been denied any at this point. That they might someday be married under the law of some state or ask for some federal benefit which they are denied is not enough. In short, they have not spelled out a legally protected interest, much less one that was injured in a concrete and particularized way.

Id. at 684 (citations omitted). The court also noted, in addition to this holding regarding constitutional standing, that plaintiffs lacked prudential standing because their challenge constituted a "generalized grievance[ ] pervasively shared," such that "[a]ny citizen or taxpayer could as easily claim that some application or other of the DOMA definition to some as yet undesignated statute, which confers some public benefit or right, might exclude that person because DOMA requires a legal union, a man, and a woman." Id. at 684, 685. On remand, this Court dismissed the case on August 29, 2008, as directed by the Court of Appeals.

The plaintiffs then filed a new Complaint challenging DOMA on November 3, 2008, this time including an allegation that they had married under California law. The proposed Complaint in that matter, docketed as Case No. SACV08-01244 UA, contained the same claims against DOMA as the Complaint herein, and named as defendants the United States of America and "Does 1 through 1,000." That Complaint was submitted with plaintiffs' Requests to Proceed in Forma Pauperis, which The Honorable Alicemarie H. Stotler denied on November 26, 2008. That matter (Case No. SACV08-01244 UA) has now been closed.

Plaintiffs filed the present Complaint in the Superior Court of California for the County of Orange on December 29, 2008, naming as defendants the United States, the State of California, and "Does 1 through 1,000." The Complaint filed in State court is identical to the Complaint submitted earlier in this Court,[1] except for the addition of the State of California as a defendant and several sentences related to the new defendant. Plaintiffs filed applications for waivers of fees and costs in State court, and those applications were granted. See Attachment 1 hereto.[2]

---

[1] Plaintiffs allege that they were married in California on July 10, 2008, see Complaint ¶ 10 — that is, approximately four months before the addition of Article 1, Section 7.5, to the State constitution, which declares that "[o]nly marriage between a man and a woman is valid or recognized in California." The California Supreme Court has rejected challenges to this new constitutional provision, but has declared that same-sex marriages contracted before its enactment remain valid. See Strauss v. Horton, 207 P.3d 48 (Cal. May 26, 2009).

[2] The State court entered form orders on both applications (Attachment 1 hereto). On both orders, the court checked the box indicating "It is ordered that the application is granted in whole." On the order regarding plaintiff Hammer's request, another box was also checked — contradictorily

(continued...)

The United States, upon learning of the action in State court, filed a Notice of Removal in this Court under 28 U.S.C. § 1442(a)(1) (Doc. #1). The parties thereafter stipulated that defendants' responses to the Complaint would be due on June 11, 2009 (Doc. #14), and the Court entered an Order pursuant to such stipulation on May 21, 2009 (Doc. # 20).

ARGUMENT

I. This Court Lacks Jurisdiction Over Plaintiffs' Claims Against the United States Because the State Court Lacked Jurisdiction

After removal of a case from State court, the district court must determine the scope of its jurisdiction. See FBI v. Superior Court of Cal., 507 F. Supp. 2d 1082, 1090 (N.D. Cal. 2007). When a case is "removed from state court pursuant to [28 U.S.C.] § 1442, [the federal court's] jurisdiction is derivative of the state court's jurisdiction." See In re Elko County Grand Jury, 109 F.3d 554, 555 (9th Cir. 1997). In other words, a federal court, after removal, "has no more jurisdiction than the state court" did before removal. See Salveson v. Western States Bankcard Ass'n, 731 F.2d 1423, 1431 (9th Cir. 1984). Thus, "if the state court from which [a case] was removed lacked subject matter jurisdiction," then the federal court will also lack jurisdiction, "even though the federal court would have had jurisdiction had the suit been brought there originally." See FBI v. Superior Court of Cal., 507 F. Supp. 2d at 1090 (quoting Beeman v. Olson, 828 F.2d 620, 621 (9th Cir.1987)); see also Glass v. National R.R. Passenger Corp., 570 F. Supp. 2d 1180, 1183 (C.D. Cal. 2008) ("This Court agrees with the discussion and holding in FBI, 507 F. Supp. 2d at 1090-92, that the derivative jurisdiction doctrine is alive and well and applies to 28 U.S.C. § 1442 removals.").[3]

---

[2](...continued)
and apparently in error — indicating that he would be required to pay certain fees.

[3] Although certain amendments to 28 U.S.C. § 1441 have eliminated the derivative jurisdiction doctrine in cases removed under that section, the doctrine continues to operate in cases removed under 28 U.S.C. § 1442. See FBI v. Superior Court of Cal., 507 F. Supp. 2d at 1091-92; see also Palmer v. City Nat'l Bank, 498 F.3d 236, 247-48 (4th Cir. 2007) (discussing reasons why "Congress decided to retain the traditional rule that removal jurisdiction is derivative of state court jurisdiction prior to removal [under § 1442]").

In this case, the Superior Court of California for the County of Orange lacked jurisdiction over plaintiffs' claims against the United States before removal. "[T]he United States has sovereign immunity and may only be sued where it has waived that immunity, subject to conditions on such waiver." Glass, id. at 1183. Absent a waiver of immunity, the United States is immune from suit in State courts. See Powelson v. United States, 150 F.3d 1103, 1105 (9th Cir. 1998) (dismissing removed matter where "[t]he government [had] not waived its immunity from suit in state courts"); Nebraska v. Bentson, 146 F.3d 676, 679 (9th Cir. 1998) ("Without an express waiver of the IRS's sovereign immunity as an agency of the United States, the state court lacked jurisdiction."). Counsel for the United States is aware of no waiver of sovereign immunity that would have applied to plaintiffs' claims against the United States in the Superior Court of California, and the Complaint in this action suggests no such waiver. Accordingly, the State court lacked jurisdiction over those claims, and this Court necessarily also lacks jurisdiction.

Furthermore, the procedural history of this case illustrates one salutary effect of the derivative jurisdiction doctrine. Plaintiffs initially filed their challenge against DOMA in this Court with a request to proceed in forma pauperis. When that request was denied, they added the State of California as a defendant and filed essentially the same action in State court approximately one month later, again with a request for waiver of fees and costs. The State court, unlike this Court, granted the request to file without payment of fees and costs. Plaintiffs have, therefore, engaged in a sort of "forum shopping" in an effort to avoid paying fees and costs. Moreover, plaintiffs' conduct, if permitted, would essentially transfer certain of their expenses to the United States, which has borne the cost of filing a notice of removal in this Court and a notification of removal in State court. Failing to dismiss an action based on the derivative jurisdiction doctrine under these circumstances would encourage this kind of conduct.

## II. Plaintiffs' Claims and Allegations Against the United States Must Be Dismissed for Lack of Standing

For several reasons — including some of the same reasons relied on by this Court, and the Ninth Circuit, in holding that plaintiffs lacked standing in their first action — the plaintiffs are still without standing to bring their present claims against the United States. Specifically, because

plaintiffs still do not "claim to have plans to seek recognition of their . . . California marriage in another state," they have not established an "imminent injury" due to Section 2. See Smelt I, 374 F. Supp. at 871. And because they still "do not suggest that they have applied for any federal benefits, much less been denied any at this point," plaintiffs still lack standing to bring any claim against Section 3 of DOMA, the definitional provision. See Smelt II, 447 F.3d at 684. Further, even if plaintiffs otherwise had standing to challenge DOMA, they would lack standing to pursue certain aspects of the sweeping nationwide relief they seek against the United States, such as their request for "a permanent injunction compelling the Defendants to take all necessary acts to require the entire nation of the United States of America, [and] all of its territories and jurisdictions, to eliminate any distinction in the law that prejudices the rights of Plaintiffs." See Complaint ¶ 8.

A. The Case or Controversy Requirement of Article III

The power of federal courts extends only to "Cases" and "Controversies," see U.S. Const. art. III, § 2, and a litigant's standing to sue is "an essential and unchanging part of the case-or-controversy requirement." See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992). To satisfy this requirement, a plaintiff must demonstrate, as the "irreducible constitutional minimum" of standing to sue, an "injury in fact", a "fairly traceable" causal connection between the injury and defendant's conduct, and redressability. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-03, 118 S. Ct. 1003, 140 L.Ed.2d 210 (1998); see also Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 12, 124 S. Ct. 2301, 2309, 159 L.Ed.2d 98 (2004) ("The plaintiff must show that the conduct of which he complains has caused him to suffer an 'injury in fact' that a favorable judgment will redress.").

The injury needed for constitutional standing must, in addition, be "concrete," "objective," and "palpable," not merely "abstract" or "conjectural" See Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S. Ct. 1717, 109 L.Ed.2d 135 (1990); Bigelow v. Virginia, 421 U.S. 809, 816-17, 95 S. Ct. 2222, 44 L.Ed.2d 600 (1975). The standing inquiry, moreover, must be "especially rigorous when," as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by [another] branch[ ] of the Federal Government was unconstitutional." Raines v. Byrd, 521 U.S.

811, 819-20, 117 S. Ct. 2312, 138 L.Ed.2d 849 (1997). And if the plaintiff lacks standing, the Court lacks subject matter jurisdiction. See FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231, 110 S. Ct. 596, 107 L.Ed.2d 603 (1990) ("standing 'is perhaps the most important of [the jurisdictional] doctrines'") (quoting Allen v. Wright, 468 U.S. 737, 750, 104 S. Ct. 3315, 82 L.Ed.2d 556 (1984)).

In addition to these constitutional mandates, the Courts adhere to certain "prudential" requirements of standing. These include, most notably for this case, "the general prohibition on a litigant's raising another person's legal rights [and] the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches." Allen v. Wright, 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L.Ed.2d 556 (1984). "There are good and sufficient reasons for th[e] prudential limitation on standing when rights of third parties are implicated — the avoidance of the adjudication of rights which those not before the Court may not wish to assert, and the assurance that the most effective advocate of the rights at issue is present to champion them." Duke Power Co. v. Carolina Envt'l Study Group, Inc., 438 U.S. 59, 80, 98 S. Ct. 2620, 57 L.Ed.2d 595 (1978). Additionally, this limitation ensures that a court does not "decide abstract questions of wide public significance even though other governmental institutions [including other courts] may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." Warth v. Seldin, 422 U.S. 490, 500, 95 S. Ct. 2197, 45 L.Ed.2d 343 (1975).

Under these principles, the plaintiffs in this action lack standing to challenge either section of DOMA under any theory, and to pursue relief of such breathtaking scope as they purport to seek in their Complaint.

### B. Plaintiffs Lack Standing to Challenge DOMA's Reservation of the States' Authority Regarding Recognition of Same-Sex Marriages Performed in Other States

Section 2 of DOMA provides that one State need not recognize a same-sex marriage performed under the laws of another State; specifically, it states that "[n]o State . . . shall be required to give effect to any public act, record, or judicial proceeding of any other State . . . respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such

other State." 28 U.S.C. § 1738C. Thus, for example, if a same-sex couple were married under the laws of California and later moved to another State that does not allow or recognize same-sex marriages, DOMA would make clear that the second State would not be required, under federal constitutional or statutory law, to recognize their California marriage.

Obviously, as plaintiffs' circumstances now stand, they cannot show that this provision of DOMA has any effect upon them. They complain that States other than California, exercising the choice preserved to them by Section 2 to withhold recognition of plaintiffs' marriage, can thus deny them rights and benefits "automatically bestowed upon opposite-gender couples," such as "decision-making authority for funeral arrangements" and "the right to bereavement leave in the event of a partner's death; the presumption that both spouses are the legal parents of a child born during marriage; and, the right to community property," among others. See Complaint ¶¶ 3, 4. These, of course, are rights and benefits that another State could deny to plaintiffs only if they were visitors, residents, and/or citizens within that State at an unknown time in the future when an occasion to assert such rights might arise. Plaintiffs allege, however, that they "reside in Orange County, California." See id. ¶ 9. They allege no plans to move to another State, and, as in their first action challenging DOMA in this Court, they do not otherwise "claim to have plans to seek recognition of their . . . California marriage in another state." Smelt I, 374 F. Supp. at 871. Accordingly, as this Court held in the prior action, "[p]laintiffs have not established an imminent injury sufficient to confer standing to challenge section 2." Id.

C. Plaintiffs Lack Standing to Challenge the Definitions of "Marriage" and "Spouse" Under Federal Law

In challenging Section 3 of DOMA, which defines the words "marriage" and "spouse" for purposes of federal law, plaintiffs allege that the refusal to recognize their marriage "results in a denial of . . . more than a thousand federal rights, benefits, and responsibilities," such as "[t]he right to social security survivor benefits" and "the right to bereavement leave in the event of a partner's

death." See Complaint ¶¶ 3-4.[4] Plaintiffs do not allege, however, that they have actually been denied any federal marital benefits because of DOMA, or even that they have applied for benefits under any program to which this statute might apply. Thus, plaintiffs have not shown that they have suffered any concrete "injury in fact" due to the definitional provision of DOMA. See Steel Co., 523 U.S. at 102-03.

In fact, by failing to allege the denial of any federal benefits because of DOMA, plaintiffs have failed to correct one of the very defects that caused the Ninth Circuit to hold that they lacked standing in their first challenge to DOMA. In finding that plaintiffs lacked standing to challenge Section 3 of DOMA, the Court of Appeals relied on the fact that the definitional provision had never been applied to them under any federal statute:

> DOMA itself simply does not injure [the plaintiffs] or exclude them from some undefined benefit to which they might have been or might someday be entitled. In fact, they do not suggest that they have applied for any federal benefits, much less been denied any at this point. That they might someday be married under the law of some state or ask for some federal benefit which they are denied is not enough. In short, they have not spelled out a legally protected interest, much less one that was injured in a concrete and particularized way.

447 F.3d at 684 (emphasis added) (citations omitted). Except for the reference to being "married under the law of some state," all of these statements remain true. Plaintiffs have still "not suggest[ed] that they have applied for any federal benefits, much less been denied any at this point." Hence, having suffered no concrete injury attributable to Section 3, either, plaintiffs are without standing to challenge its constitutionality.

### D. Plaintiffs Cannot Establish Standing to Seek Certain Sweeping Relief Requested in Their Complaint

Even if plaintiffs otherwise had standing to challenge either Section 2 or Section 3 of DOMA, plaintiffs would lack standing to pursue the expansive relief alluded to in their Complaint. Specifically:

---

[4] All of the other examples given in the Complaint are products of State law, to the extent they are supported by law at all: "decision-making authority for funeral arrangements and disposition of the body . . . the presumption that both spouses are the legal parents of a child born during marriage; and, the right to community property, and a share of separate property, upon the death of a partner who dies intestate." See Complaint ¶ 4.

- Plaintiffs purport to seek "a permanent injunction compelling the Defendants to take all necessary acts to require the entire nation of the United States of America, [and] all of its territories and jurisdictions, to eliminate any distinction in the law that prejudices the rights of Plaintiffs." See Complaint ¶ 8 (emphasis added).

- And plaintiffs request "declaratory judgment establishing any law that restricts Plaintiffs' rights or distinguishes Plaintiffs' rights in any way from any opposite gender married couple to be unconstitutional, under the United States Constitution." Id. (emphasis added).

Although plaintiffs do not include requests of this nature among their prayers for relief, the above-quoted paragraph in the Complaint explicitly "ask[s] for" and "seek[s]" this relief. Id.

Plaintiffs lack standing to pursue these requests, under both constitutional and prudential requirements of standing. From a constitutional standpoint, plaintiffs have not attempted to allege an "injury in fact" — or any specific effect at all upon them — due to "any" law other than DOMA. And since they have not even identified any particular "conduct of which [they] complain[ ]," other than DOMA, plaintiffs would necessarily be unable to show how any such laws have "caused [them] to suffer an 'injury in fact' that a favorable judgment will redress." See Elk Grove Unified School Dist., 542 U.S. at 12. Further, judgment against the present defendants — the United States government and one State — could not possibly redress every alleged injury to the plaintiffs from "any distinction in the law" throughout "the entire nation of the United States of America, all of its territories and jurisdictions." See Complaint ¶ 8.

These aspects of the Complaint also seek to "rely on the rights or interests of third parties," in violation of the prudential requirements of standing. See Hong Kong Supermarket v. Kizer, 830 F.2d 1078, 1081 (9th Cir. 1987). Only those who suffer cognizable injury due to laws in other "territories and jurisdictions" have standing to challenge those laws. See Complaint ¶ 8. As the Supreme Court has held, "even if a governmental actor is discriminating on the basis of [a suspect classification], the resulting injury 'accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct.'" United States v. Hays, 515 U.S. 737, 743-44, 115 S. Ct. 2431, 132 L.Ed.2d 635 (1995) (quoting Allen, 468 U.S. at 755). This rule "applies with as much force in the equal protection context as in any other." Hays, id. at 743.

III. DOMA Is a Valid Exercise of Congress's Power under the Full Faith and Credit Clause

Even if the Court had subject matter jurisdiction to hear plaintiffs' claims, it would nevertheless have to dismiss them on the merits. Plaintiffs assert that Section 2 of DOMA — which preserves a State's prerogative to decline to give "effect" to another State's laws respecting same-sex marriage — violates the Full Faith and Credit Clause of the Constitution. See Complaint ¶ 28. This challenge fails as a matter of law.

Section 2 is fully consistent with the Full Faith and Credit Clause, for two important reasons. First, the principle of according "Full Faith and Credit" has never been construed to require one State to give absolute deference to another State's laws in all circumstances. Rather, this provision has long been understood to leave room for the application of traditional principles of conflict of laws, including the concept that each State retains the authority to decline to apply another State's law when it conflicts with its own legitimate public policies. Section 2 of DOMA easily fits within this principle, which has long been applied to recognize the power of each State to apply its own licensing standards — including, specifically, for marriage licenses — when they conflict with those of another State. Second, in any event, plaintiffs completely ignore the second sentence of the Full Faith and Clause, which expressly empowers Congress to prescribe "the Effect" of one State's laws in another State, and clearly condones the exercise of that power in DOMA. Under any conceivable construction of this "effects" provision, Congress clearly has the power to recognize the authority of each State to give primacy to its own standards for marriage licensing and to decline to give effect to the conflicting standards of another.

A. Section 2 is Consistent With Common Law Conflicts Principles

The principle of "Full Faith and Credit" has never been construed to require the States literally to give effect, in all circumstances, to the statutes or judgments of other States. Indeed, "[a] rigid and literal enforcement of the full faith and credit clause, without regard to the statute of the forum, would lead to the absurd result that, wherever the conflict arises, the statute of each state

must be enforced in the courts of the other, but cannot be in its own." Alaska Packers Ass'n v. Industrial Accident Comm'n, 294 U.S. 532, 547, 55 S. Ct. 518, 79 L. Ed. 1044 (1935).

Consistent with this principle, the Supreme Court has indicated that the Framers of the Constitution had an "expectation" that the Full Faith and Credit Clause "would be interpreted against the background of principles developed in international conflicts law." Sun Oil Co. v. Wortman, 486 U.S. 717, 723 & n.1, 108 S. Ct. 2117, 100 L.Ed.2d 743 (1988). And, as the Court has repeatedly acknowledged, longstanding principles of conflicts of law do "not require a State to apply another State's law in violation of its own legitimate public policy." See, e.g., Nevada v. Hall, 440 U.S. 410, 422, 99 S. Ct. 1182, 59 L.Ed.2d 416 (1979); see also Williams v. North Carolina, 317 U.S. 287, 296, 63 S. Ct. 207, 87 L. Ed. 279 (1942) ("Nor is there any authority which lends support to the view that the full faith and credit clause compels the courts of one state to subordinate the local policy of that state, as respects its domiciliaries, to the statutes of any other state."). Under this longstanding public policy doctrine, out-of-state statutes or acts that are contrary to the forum State's policy need not be followed under the Full Faith and Credit Clause. See, e.g., Pacific Employers Ins. Co. v. Industrial Accident Comm'n, 306 U.S. 493, 501, 59 S. Ct. 629, 83 L. Ed. 940 (1939) (holding that California courts need not apply Massachusetts law of workers compensation to Massachusetts employee of Massachusetts employer, where that law was contrary to California's "policy to provide compensation for employees injured in their employment within the state"); see also Hilton v. Guyot, 159 U.S. 113, 167, 16 S. Ct. 139, 40 L. Ed. 95 (1895) ("A judgment affecting the status of persons, such as a decree confirming or dissolving a marriage, is recognized as valid in every country, unless contrary to the policy of its own law."); Bank of Augusta v. Earle, 38 U.S. (13 Pet.) 519, 589, 10 L. Ed. 274 (1839) (noting the longstanding principle of conflicts that the laws of one country "will, by the comity of nations, be recognised and executed in another . . . provided that law was not repugnant to the laws or policy of their own country") (emphasis added).

The courts have followed this principle, moreover, in relation to the validity of marriages performed in other States. Both the First and Second Restatements of Conflict of Laws recognize that State courts may refuse to give effect to a marriage, or to certain incidents of a marriage, that

contravene the forum State's policy. See Restatement (First) of Conflict of Laws § 134; Restatement (Second) of Conflict of Laws § 284.[5] And the courts have widely held that certain marriages performed elsewhere need not be given effect, because they conflicted with the public policy of the forum. See, e.g., Catalano v. Catalano, 170 A.2d 726, 728-29 (Conn. 1961) (marriage of uncle to niece, "though valid in Italy under its laws, was not valid in Connecticut because it contravened the public policy of th[at] state"); Wilkins v. Zelichowski, 140 A.2d 65, 67-68 (N.J. 1958) (marriage of 16-year-old female held invalid in New Jersey, regardless of validity in Indiana where performed, in light of N.J. policy reflected in statute permitting adult female to secure annulment of her underage marriage); In re Mortenson's Estate, 316 P.2d 1106 (Ariz. 1957) (marriage of first cousins held invalid in Arizona, though lawfully performed in New Mexico, given Arizona policy reflected in statute declaring such marriages "prohibited and void").

Accordingly, Section 2 of DOMA hews to long-established principles in relation to the recognition of marriages performed in other States, and ensures that States may continue to rely on their own public policies to reject (or accept) requests to recognize same-sex marriages. The fact that States have long had the authority to decline to give effect to marriages performed in other States based on the forum State's public policy strongly supports the constitutionality of Congress's exercise of its authority in DOMA. Surely the Full Faith and Credit Clause cannot be read, in light of these established principles, to preclude a State from applying its own definition of marriage in situations involving same-sex couples, married elsewhere, who are domiciled within its own borders. That Clause clearly does not mandate such interference with "long established and still subsisting choice-of-law practices." Sun Oil Co., 486 U.S. at 728-29.

---

[5] Among the "incidents" of marriage mentioned in the Restatement (Second) of Conflict of Laws are "that the spouses may lawfully cohabit as man and wife . . . the marital property interests which each spouse may have in the other's assets . . . the forced share or intestate share which the surviving spouse has in the estate of the deceased spouse [and] that a party to the marriage is the 'spouse' of the other . . . within the meaning of these terms when used in a will, trust or other instrument." See Restatement (Second) of Conflict of Laws § 284 cmt. a.

B. Section 2 Was Enacted Under Congress's Authority to Prescribe to Prescribe the "Effect" of One State's Acts in Other States

The constitutionality of Section 2 of DOMA is further confirmed by the second sentence of the Full Faith and Credit Clause, which expressly empowers Congress to prescribe "the Effect" to be accorded to the laws of a sister State. See U.S. Const. art. IV, § 1, cl. 2. Although the broad contours of this provision have not been conclusively established, the power exercised by Congress in enacting DOMA clearly conforms to any conceivable construction of the effects provision.

First, there is ample support in both history and case law for according plenary power to Congress under the effects provision. When the Framers considered the Full Faith and Credit Clause, they explained that it was designed to make up for the inadequacies of a predecessor provision in the Articles of Confederation — a provision that called for according full faith and credit to a sister State's laws, but that recognized no legislative power to prescribe the "effect" of such laws. In the Framers' view, the provision in the Articles of Confederation was "deficien[t]," because it did not "declare what was to be the effect of a judgment obtained in one state in another state." McElmoyle ex rel. Bailey v. Cohen, 38 U.S. (13 Pet.) 312, 325-26, 10 L. Ed. 177 (1839) (Mem) (emphasis added). In the absence of any provision as to such "effect," the Framers viewed the meaning of "full faith and credit" as "extremely indeterminate," and "of little importance."[6]

As the Supreme Court explained in McElmoyle, this historical record accords limited significance to the first sentence of the Full Faith and Credit Clause, and plenary power to Congress to prescribe the substantive effects of a sister State's laws. Specifically, the first sentence merely provides that the judgments of one State "are only evidence in a sister state that the subject matter of the suit has become a debt of record." McElmoyle, id. at 325 (emphasis added). It "does not declare what was to be the effect of a judgment obtained in one state in another state," id. (emphasis added); the prescription of any substantive effect of a sister State's laws is left to Congress under the second sentence — the effects provision.

[6] See The Federalist No. 42, at 271 (James Madison) (Clinton Rossiter ed., 1961) ("The meaning of the [the full faith and credit clause in the Articles] is extremely indeterminate, and can be of little importance under any interpretation which it will bear.").

This same construction was embraced by the Court in Mills v. Duryee, 11 U.S. (7 Cranch) 481, 3 L. Ed. 411 (1813). At issue in Mills was the Full Faith and Credit statute of 1790, now codified in substantially similar terms at 28 U.S.C. § 1738, which provided that one State's judgment would have the same effect in other States as it would have in the rendering State. In rejecting a reading of the statute that would treat "judgments of the state Courts . . . as prima facie evidence only," the Court noted that "the constitution contemplated a power in congress to give a conclusive effect to such judgments." Id. at 485 (emphasis added). As in McElmoyle, then, the Mills decision reads the effects provision — not the first sentence of the Full Faith and Credit Clause — as conferring on Congress the broad power "to give a conclusive effect" to the laws of another State.

Under this view, Congress obviously acted within its plenary effects power in enacting Section 2 of DOMA. If the Constitution itself does not declare "the effect" of the law of "one state in another state," McElmoyle, 38 U.S. (13 Pet.) at 325, but instead leaves that "power in congress," Mills, 11 U.S. (7 Cranch) at 485, then Congress clearly had the authority in DOMA to declare that no State is "required to give effect" to the same-sex marriage laws of other States. 28 U.S.C. § 1738C.

Moreover, the Court need not embrace this plenary reading of Congress's effects power in order to sustain Section 2 of DOMA. Whatever the breadth of Congress's power under the Full Faith and Credit Clause, it clearly encompasses the authority to confirm the applicability of one of the longstanding, generally applicable principles of conflicts law that formed the background to the Clause. See Sun Oil Co., 486 U.S. at 723 & n.1. As explained in detail above, one such principle was the public policy doctrine, which has long recognized the sovereign authority of the States to decline to give effect to the laws of a sister State at variance with their own legitimate public policy. Section 2 of DOMA merely confirms the specific applicability of that longstanding principle in the context of laws regarding same-sex marriage.

This exercise of Congress's effects power easily fits within any conceivable construction of this provision. As the Supreme Court recognized in Sun Oil Co., the conflicts law that formed the "background" of the Full Faith and Credit Clause was common law, subject to further

"development." Id. In authorizing Congress to declare the "effect" of one State's laws in another State, the Constitution empowers Congress, at the very least, to codify the applicability of a long-standing common law principle in a context where State public policies are poised to clash. That is all that Congress has done in enacting Section 2 of DOMA, and its exercise of that authority must be upheld under any reasonable interpretation of its power.

## IV. DOMA Cannot Be Said to Violate an Asserted "Right to Travel"

In addition to their Full Faith and Credit Clause claim, plaintiffs contend that DOMA violates an asserted "right to travel." See Complaint ¶ 17. Although the complaint does not specify, presumably plaintiffs are referring to the freedom to travel from one State to another, long protected by the Constitution as a basic right. See Shapiro v. Thompson, 394 U.S. 618, 629-31, 89 S. Ct. 1322, 22 L.Ed.2d 600 (1969). This claim also fails.

To begin with, plaintiffs lack standing to raise this claim. They have failed to allege any plans to travel to, reside in, or become citizens of any State other than California. They thus do not and cannot allege that DOMA has actually interfered with such travel. See Whitmore, 495 U.S. at 155, 157, 158 (injury alleged cannot be "conjectural or hypothetical," "speculative," or "abstract," but must be "certainly impending").

In all events, DOMA simply does not curtail anyone's right to travel. It merely permits each State to follow its own policy with respect to marriage, and defines that term for purposes of federal statutes. Thus, DOMA does not affect "the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, [or], for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." Saenz v. Roe, 526 U.S. 489, 500, 119 S. Ct. 1518, 143 L.Ed.2d 689 (1999) (noting that "right to travel" cases embrace these three components).

Furthermore, given that DOMA merely codifies long-standing principles of conflict of laws under Congress's express authority to prescribe the effect of one State's acts in the other States, it cannot violate any implied constitutional "right to travel." Requiring adherence to one State's

codified social policies by every other State, in the name of a right to travel, would eliminate conflict-of-laws principles in this context and "would lead to the absurd result that, wherever [a] conflict arises, the statute of each state must be enforced in the courts of the other, but cannot be in its own." Alaska Packers Ass'n, 294 U.S. at 547; see Ellis v. Anderson, 901 S.W. 2d 46, 47-48 (Ky. Ct. App. 1995) (notwithstanding right to travel, "states have considerable power to adopt an appropriate conflict of laws doctrine in a situation touching more than one state"); Miller v. Stauffer Chem. Co., 581 P.2d 345, 348-49 (Idaho 1978) (same). Put differently, the plaintiffs' theory of the to travel would invalidate the Constitution's express grant of authority to Congress to prescribe "the Effect" to be accorded to the laws of another State. As the Supreme Court has held, "Full Faith and Credit does not . . . enable one state to legislate for the other or to project its laws across state lines . . . ." Nevada v. Hall, 440 U.S. at 423-24. The Full Faith and Credit Clause expressly preserves this State sovereign prerogative, and surely no implicit "right to travel" can be read to take it away.

V. DOMA Is Consistent with Equal Protection and Due Process Principles

Plaintiffs further allege that DOMA violates their rights under the Due Process Clause of the Fifth Amendment, including its equal protection component. DOMA, however, merely preserves for each State the authority to follow its own law and policy with respect to same-sex marriage for purposes of State law. And it maintains the status quo of federal policy, preserving a longstanding federal policy of promoting traditional marriages, by clarifying that the terms "marriage" and "spouse," for purposes of federal law, refer to marriage between a man and a woman, and do not encompass relationships of any other kind within their ambit. Thus, because DOMA does not make a suspect classification or implicate a right that has been recognized as fundamental, it is necessarily subject to rational-basis scrutiny, see National Ass'n for Advancement of Psychoanalysis v. California Bd. of Psychology, 228 F.3d 1043, 1049 (9th Cir. 2000), which it satisfies.

Congress makes a wide array of federal financial and other benefits available to men and women united in marriage — to the exclusion of all other human relationships (save for that of parent and minor child), not just same-sex marriage. In enacting DOMA, Congress (1) recognized

the right of some States to expand the traditional understanding of marriage while, at the same time, it (2) protected the rights of other States to adhere to their traditional understandings of the institution, and (3) maintained the longstanding federal policy of affording benefits to the traditional, and universally recognized, version of marriage. This measured response to society's evolving understandings of marriage is entirely rational. Indeed, under rational basis scrutiny, Congress is entitled to respond to new social phenomena one step at a time, and to adjust national policy incrementally. DOMA reflects just such a response. It adopts on the national level, and permits on the state level, a wait-and-see approach to new forms of marriage. DOMA thus maximizes democratic flexibility under our federalist scheme, by simply preventing some States from requiring other States and the federal government to grant benefits to forms of marriages that, under their own constitutions, state or federal governments are not obligated to recognize. Because it is rationally related to legitimate governmental interests, plaintiffs cannot overcome the "presumption of constitutionality" that DOMA, like all federal statutes, enjoys. See, e.g., Califano v. Gautier Torres, 435 U.S. 1, 5, 98 S. Ct. 906, 55 L.Ed.2d 65 (1978).

### A. Federal Courts Have Unanimously Upheld the Constitutionality of DOMA

DOMA codifies, for purposes of federal statutes, regulations, and rulings, the longstanding, traditional definition of marriage as "a legal union between one man and one woman as husband and wife," see 1 U.S.C. § 7, and preserves to each State the ability to retain that definition as its policy if the State so chooses, or to alter it, as it sees fit. See 28 U.S.C. § 1738C.[7] As far as counsel for the defendants are aware, every court to address a federal constitutional challenge to this definition of marriage has rejected the challenge. See, e.g., Citizens for Equal Protection v. Bruning, 455 F.3d

[7] Portions of plaintiffs' Complaint confuse the United States Code citations for the two substantive sections of DOMA. As stated correctly in paragraphs 15 and 16 of the Complaint, Section 2 of DOMA, which provides that a State is not required to give effect to a same-sex marriage from another State, is codified at 28 U.S.C. § 1738C, and Section 3, which defines "marriage" and "spouse" for purposes of federal law (erroneously called the "Federal Definition of Marriage Act" in paragraph 15), is codified at 1 U.S.C. § 7. Most of the remainder of the Complaint, however, reverses those citations, referring to 28 U.S.C. § 1738C as the "Federal Definition of Marriage Act" and to 1 U.S.C. § 7 as the "Federal Defense of Marriage Act."

859, 864-69 (8th Cir. 2006); Lofton v. Secretary of Dep't of Children & Family Servs., 358 F.3d 804, 811-27 (11th Cir. 2004); Adams v. Howerton, 673 F.2d 1036, 1041-43 (9th Cir. 1982); Dean v. District of Columbia, 653 A.2d 307, 331-33, 362-64 (D.C. 1995); Baehr v. Lewin, 852 P.2d 44, 55-57 (Haw. 1993); Baker v. Nelson, 191 N.W.2d 185, 186-87 (Minn. 1971), appeal dismissed, 409 U.S. 810, 93 S. Ct. 37, 34 L.Ed.2d 65 (1972) (mem).

Indeed, a number of federal courts have specifically addressed the constitutionality of one or both sections of DOMA, and have expressly upheld them against all constitutional challenges. See Smelt v. County of Orange, 374 F. Supp. 2d 861 (C.D. Cal. 2005) (Section 3), vacated on other grounds, 447 F.3d 673 (9th Cir. 2006); Wilson v. Ake, 354 F. Supp. 2d 1298 (M.D. Fla. 2005) (Section 2 and Section 3); In re Kandu, 315 B.R. 123 (Bankr. W. D. Wash. 2004) (Section 3), appeal dismissed Kandu v. United States Trustee, Case No. 3:04-cv-05544-FDB (W.D. Wash.) [hereinafter Kandu]; see also Bishop v. Oklahoma, 447 F. Supp. 2d 1239 (N.D. Okla. 2006) (rejecting certain constitutional challenges but deferring others pending further development). This Court should do likewise here.

Romer v. Evans, which was decided before all of these cases, does not compel a different conclusion. 517 U.S. 620, 116 S. Ct. 1620, 134 L.Ed.2d 855 (1996). In Romer, the Supreme Court applied rational-basis review to invalidate a State constitutional amendment of "unprecedented" breadth that barred homosexuals from securing any protection under State or local anti-discrimination statutes or ordinances. Id. at 633. The amendment bore no rational relationship to any legitimate government interest, raising an "inevitable inference" that it was born solely "of animosity toward [homosexuals]." Id. at 634-35.

For purposes of Fifth Amendment analysis, DOMA cannot be equated with the Colorado amendment struck down in Romer. "DOMA is not . . . exceptional and unduly broad." Kandu, 315 B.R. at 147-48 (distinguishing DOMA and the amendment in Romer on that basis); cf. Standhardt v. Superior Court, 77 P.3d 451, 464-65 (Ariz. Ct. App. 2003) (rejecting challenge to State definition of marriage). Codifying the traditional definition of marriage, moreover, is by no means "unprecedented." See Kandu, 315 B.R. at 148 ("DOMA simply codified that definition of marriage

historically understood by society"). And, unlike the Colorado amendment struck down in Romer, DOMA is rationally related to legitimate government interests and cannot fairly be described as "born of animosity toward the class of persons affected." Romer, 517 U.S. at 634. DOMA simply preserves longstanding federal and state policies that have afforded protections and privileges to a traditional form of marriage, while simultaneously recognizing the right of States to extend such protections and privileges to same-sex marriage. Under our federalist system, preserving the autonomy of state and federal governments to address evolving definitions of an age-old societal institution is itself a legitimate governmental interest. Moreover, because DOMA protected "the ability of elected officials to decide matters related to homosexuality," including their right to recognize same-sex marriage, it plainly was not born solely as a result of animosity towards homosexuals. See H.R. Rep. No. 104-664, at 17, reprinted in 1996 U.S.C.C.A.N. at 2921.

Nor does the Supreme Court's decision in Lawrence v. Texas overrule or otherwise undermine the precedents, cited above, that uphold DOMA. In Lawrence, the Supreme Court held that the government cannot criminalize private, consensual, adult sodomy. At the same time, the Court unequivocally noted that the case before it did "not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." 539 U.S. 558, 578, 123 S. Ct. 2472, 156 L.Ed.2d 508 (2003) (emphasis added). Thus, in light of this limiting language, Lawrence simply does not address the affirmative right to receive official and public recognition of a same-sex relationship. Because Lawrence declined to address any question regarding marriage, it does not disturb prior precedents in which the courts have declined to recognize a federal constitutional right to same-sex marriage.

B. DOMA Does Not Impinge Upon Rights That Have Been Recognized as Fundamental

Even in the absence of the foregoing precedents, plaintiffs' equal protection and substantive due process claims still would fail as a matter of law. Most such claims are subject to "rational basis" review, under which the challenged statute will be upheld "as long as it bears a rational relation to a legitimate state interest." See Squaw Valley Dev. Co. v. Goldberg, 375 F.3d 936, 944

(9th Cir. 2004) (equal protection); accord Richardson v. City & County of Honolulu, 124 F.3d 1150, 1162 (9th Cir. 1997) (due process). Only if the statute "makes a suspect classification or implicates a fundamental right" will it be subjected to a higher standard of review. National Ass'n for Advancement of Psychoanalysis, 228 F.3d at 1049. In this case, because DOMA does not impinge upon any fundamental right, it is not entitled to heightened scrutiny.

A fundamental constitutional right protected by the Due Process Clause is one that is "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S. Ct. 2258, 138 L.Ed.2d 772 (1997). The Supreme Court has mandated extreme caution in elevating individual liberty interests, no matter how genuinely and profoundly important they may be to the parties asserting them, to the status of fundamental constitutional rights. As the Court has explained:

> By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court.

Glucksberg, id. at 720 (citations and internal quotation marks omitted); see Williams v. Attorney Gen. of Ala., 378 F.3d 1232, 1250 (11th Cir. 2004) (observing that conferring constitutional status on an asserted right prevents future revision through democratic process). Accordingly, only a "small number" of substantive rights qualify under the Fifth Amendment as "fundamental." United States v. Deters, 143 F.3d 577, 582 (10th Cir. 1998).

A court must reach a "careful description" of the alleged right before determining whether it is fundamental. Glucksberg, 521 U.S. at 721. Most importantly, the asserted right must be defined with specificity, rather than in general terms. Only when this specific, "careful description" is reached can a court proceed to determine whether the asserted right is fundamental.[8]

---

[8] For example, in Washington v. Glucksberg, the right was not — properly characterized — a "right to die," but rather a "right to commit suicide." 521 U.S. at 722-23. Similarly, in Reno v. Flores, in which juvenile aliens challenged their detention by the government, the Supreme Court rejected an invitation to characterize the asserted right as "freedom from physical restraint," and (continued...)

Here, the asserted right on which plaintiffs' claims rest in this case is not a right to marry. DOMA does not prohibit gay and lesbian couples from marrying. It does not prohibit the States from acknowledging gay marriages. And it does not in any way penalize those couples, or States, that do so. Instead, plaintiffs' claims rest on an asserted right to receive federal benefits on the basis of a relationship other than the sole relationship on which Congress (and many States) have decided to base eligibility for such benefits. Thus, properly characterized, the right asserted here is far from fundamental, as there is no constitutional right to State or federal financial benefits. See, e.g., Lavine v. Milne, 424 U.S. 577, 584 n.9, 96 S. Ct. 1010, 47 L.Ed.2d 249 (1976) ("Welfare benefits are not a fundamental right, and neither the State nor Federal Government is under any sort of constitutional obligation to guarantee minimum levels of support.") (citing Dandridge v. Williams, 397 U.S. 471, 90 S. Ct. 1153, 25 L.Ed.2d 491 (1970)).

Even viewing the right asserted here as the right of gay and lesbian couples to marry, DOMA does not directly or substantially interfere with the ability of anyone, including homosexuals, to marry the individual of his or her choice. Instead, Section 2 of DOMA simply underscores that, notwithstanding the evolution in some States' legal understanding of marriage, the remaining States may continue to follow their own policy so far as recognition of same-sex marriage is concerned, a prerogative they already retained, as discussed above, under the conflict-of-laws principles that underlie the Full Faith and Credit Clause. Hence, under DOMA, gay and lesbian couples suffer no greater interference with their ability to obtain recognition of their marriages, either in the States where they were wed, or elsewhere.

Likewise, Section 3 of DOMA merely clarifies that federal policy is to make certain benefits available only to those persons united in heterosexual marriage, as opposed to any other possible relationship defined by law, family, or affection. As a result, gay and lesbian individuals who unite

---

[8](...continued)
instead characterized it as "the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution." 507 U.S. 292, 302, 113 S. Ct. 1439, 123 L.Ed.2d 1 (1993).

in matrimony are denied no federal benefits to which they were entitled prior to their marriage; they remain eligible for every benefit they enjoyed beforehand. DOMA simply provides, in effect, that as a result of their same-sex marriage they will not become eligible for the set of benefits that Congress has reserved exclusively to those who are related by the bonds of heterosexual marriage.

In short, then, the failure in this manner to recognize a certain subset of marriages that are recognized by a certain subset of States cannot be taken as an infringement on plaintiffs' rights, even if same-sex marriage were accepted as a fundamental right under the Constitution. See DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 196, 109 S. Ct. 998, 103 L.Ed.2d 249 (1989) (Due Process Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual"); Lyng v. Automobile Workers, 485 U.S. 360, 368, 108 S. Ct. 1184, 99 L.Ed.2d 380 (1987) (holding that a decision "not to subsidize the exercise of a fundamental right does not infringe the right."); Harris v. McRae, 448 U.S. 297, 317-18, 100 S. Ct. 2671, 65 L.Ed.2d 784 (1980) ("Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference with freedom of choice in the context of certain personal decisions, it does not confer an entitlement to such [government assistance] as may be necessary to realize all the advantages of that freedom."); see also Rust v. Sullivan, 500 U.S. 173, 201, 111 S. Ct. 1759, 114 L.Ed.2d 233 (1991); Webster v. Reproductive Health Servs., 492 U.S. 490, 507, 109 S. Ct. 3040, 106 L.Ed.2d 410 (1989).

Finally, regardless of whether same-sex marriage is appropriate policy, under current legal precedent there is no constitutional right to it, and that precedent is binding on these parties and this Court. While the Supreme Court has held that the right to marry is "fundamental," Zablocki v. Redhail, 434 U.S. 374, 383-87, 98 S. Ct. 673, 54 L.Ed.2d 618 (1978), that right has not been held to encompass the right to marry someone of the same sex. To the contrary, in Baker v. Nelson, the Supreme Court dismissed a claim that the Constitution provides a right to same-sex marriage for lack of a "substantial federal question." 409 U.S. 810, 93 S. Ct. 37, 34 L.Ed.2d 65 (1972) (Mem). In Baker, the Minnesota Supreme Court had rejected the contention that a State statute limiting

marriage to one man and one woman violated federal due process and equal protection principles. The court found no "fundamental right" to same-sex marriage, 191 N.W.2d at 186-87, and concluded that the traditional definition of marriage effects no "invidious discrimination," and that the definition easily withstood rational-basis review. Id. at 187.

Invoking the Supreme Court's then-mandatory appellate jurisdiction, see 28 U.S.C. § 1257(2) (repealed 1988), a same-sex couple sought review of those rulings. See Jurisdictional Statement, Baker v. Nelson, No. 71-1027, at 3 (Attachment 2 hereto)[9] (questions presented include whether denial of same-sex marriage "deprives appellants of their liberty to marry . . . without due process of law under the Fourteenth Amendment" and "violates their rights under the equal protection clause . . .").[10] Upon review, the Supreme Court dismissed the appeal "for want of a substantial federal question." 409 U.S. at 810.

The decision in Baker has precedential effect and is binding here. As the Supreme Court has explained, a dismissal for lack of a substantial federal question is a decision on the merits. See Hicks v. Miranda, 422 U.S. 332, 343-44, 95 S. Ct. 2281, 45 L.Ed.2d 223 (1975). Referring to an earlier appeal that had been dismissed for lack of a substantial federal question, the Court said in Hicks:

> That case was an appeal from a decision by a state court upholding a state statute against federal constitutional attack. A federal constitutional issue was properly presented, it was within our [mandatory] appellate jurisdiction . . . and we had no discretion to refuse adjudication of the case on its merits . . . . We are not obligated to grant the case plenary consideration, and we did not; but we were required to deal with its merits. We did so by concluding that the appeal should be dismissed because the constitutional challenge to the California statute was not a substantial one.

---

[9] Submission of the two attachments to this memorandum does not convert the United States' motion to dismiss into a motion for summary judgment. See, e.g., Papasan v. Allain, 478 U.S. 265, 268 n.1, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986) (court may consider matters of public record in adjudicating motion to dismiss); Shaw v. Hahn, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995) ("In deciding whether to dismiss a claim under [Rule] 12(b)(6), a court may look beyond the plaintiff's complaint to matters of public record.").

[10] Because Baker held that the denial of same-sex marriage did not violate the equal protection clause, it also relevant to our argument that DOMA does not make distinctions based on any suspect classifications. See infra at Part V.C.

Id. (emphasis added). As the Eighth Circuit has observed, therefore, the Supreme Court's dismissal in Baker is "binding on the lower federal courts." McConnell v. Nooner, 547 F.2d 54, 56 (8th Cir. 1976) (per curiam); accord Adams, 673 F.2d at 1039 n.2 (acknowledging that Supreme Court's dismissal in Baker "operate[d] as a decision on the merits"). Moreover, "dismissals for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction." Mandel v. Bradley, 432 U.S. 173, 176, 97 S. Ct. 2238, 53 L.Ed.2d 199 (1977).

Accordingly, Baker stands for the proposition that equal protection principles do not bar the States from limiting marriage to one man and one woman. This precedent is binding on the federal courts. See Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S. Ct. 1917, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [a lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); see also Agostini v. Felton, 521 U.S. 203, 237-38, 117 S. Ct. 1997, 138 L.Ed.2d 391 (1997) ("The Court neither acknowledges nor holds that other courts should ever conclude that its more recent cases have, by implication, overruled an earlier precedent."); Wilson, 354 F. Supp. 2d at 1305 ("The Supreme Court has not explicitly or implicitly overturned its holding in Baker or provided the lower courts, including this Court, with any reason to believe that the holding is invalid today."). It follows, therefore, that the federal government may incorporate the traditional opposite-sex definition of marriage for purposes of federal statutes, and (in exercise of its express authority under the Full Faith and Credit Clause) may permit the States to retain this definition as well.

In short, therefore, DOMA, understood for what it actually does, infringes on no one's rights, and in all events it infringes on no right that has been constitutionally protected as fundamental, so as to invite heightened scrutiny.

C. DOMA Does Not Rest on Any Suspect Classification

Plaintiffs also maintain that DOMA discriminates on the basis of sexual orientation, in violation of their right to the equal protection of the law, see Complaint, ¶ 20, but DOMA is not subject to heightened scrutiny on that basis. As an initial matter, plaintiffs misperceive the nature of

the line that Congress has drawn. DOMA does not discriminate against homosexuals in the provision of federal benefits. To the contrary, discrimination on the basis of sexual orientation is prohibited in federal employment and in a wide array of federal benefits programs by law, regulation, and Executive order. See, e.g., 13 C.F.R. § 127.303(b)(3) (small business assistance); 31 C.F.R. § 0.214(a) (prohibiting discrimination by Department of the Treasury employees against other employees, applicants for employment, or "person[s] dealing with the Department on official business"); Exec. Order No. 13,160, § 1-102, 65 Fed. Reg. 39,773 (June 23, 2000), reprinted in 42 U.S.C. § 2000d note (nondiscrimination in federally conducted education and training programs); Exec. Order No. 11,478, § 1, 34 Fed. Reg. 12,985 (Aug. 8, 1969), reprinted as amended in 42 U.S.C.A. § 2000e note (equal employment opportunity in federal government). Within the context of such programs, Section 3 of DOMA does not distinguish among persons of different sexual orientations, but rather it limits federal benefits to those who have entered into the traditional form of marriage. See infra at 33-36. Section 2 merely reserves to the States the prerogative to make the same choice.

Even if viewed as establishing a classification on the basis of sexual orientation, DOMA still could not be subjected to heightened scrutiny on the theory that it draws any suspect classification; the Ninth Circuit has concluded that sexual orientation does not constitute a suspect classification. See High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 571 (9th Cir. 1990) (rejecting challenge to policy of conducting expanded investigations of homosexual applicants for security clearances). That holding is of course binding here.

DOMA also does not discriminate on the basis of sex. See Complaint ¶ 19. To begin with, the effect of DOMA — to the extent the statute has any direct effect on a person — is the same on men and women. See Wilson, 354 F. Supp. 2d at 1307-08 ("DOMA does not discriminate on the basis of sex because it treats women and men equally."). Thus, as the court noted in Kandu, in holding that DOMA does not discriminate on the basis of sex, "Women, as members of one class, are not being treated differently from men, as members of a different class." Kandu, 315 B.R. at 143.

Loving v. Virginia is not to the contrary. There the Supreme Court rejected a contention that the assertedly "equal application" of a statute prohibiting interracial marriage immunized the statute from strict scrutiny. 388 U.S. 1, 8, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). The Court had little difficulty concluding that the statute, which applied only to "interracial marriages involving white persons," was "designed to maintain White Supremacy" and therefore unconstitutional. Id. at 11. No comparable purpose is present here, however, for DOMA does not seek in any way to advance the "supremacy" of men over women, or of women over men. Thus DOMA cannot be "traced to a . . . purpose" to discriminate against either men or women. Personnel Adm'r v. Feeney, 442 U.S. 256, 272, 99 S. Ct. 2282, 60 L.Ed.2d 870 (1979). In upholding the traditional definition of marriage, numerous courts have expressly rejected an alleged analogy to Loving. See, e.g., Kandu, 315 B.R. at 144 ("[T]he Supreme Court did not hold [in Lawrence] that same-sex couples constitute a suspect or semi-suspect class under an equal protection analysis."); Baker v. Vermont, 744 A.2d 864, 880 n.13 (Vt. 1999) (rejecting claim that "defining marriage as the union of one man and one woman discriminates on the basis of sex"); Singer v. Hara, 522 P.2d 1187, 1191-92 (Wash. Ct. App. 1974); Baker v. Nelson, 191 N.W.2d at 187; see also Dean, 653 A.2d at 362-63 & n.2 (Steadman, A.J., concurring) ("It seems to me to stretch the concept of gender discrimination to assert that it applies to treatment of same-sex couples differently from opposite-sex couples.").

D. DOMA Satisfies Rational-Basis Review

Because DOMA neither burdens fundamental rights nor allocates federal benefits on the basis of a suspect classification, it is necessarily subject only to rational-basis review. See, e.g., Glucksberg, 521 U.S. at 728. The Supreme Court has described the elements of rational-basis review in Heller v. Doe:

> [R]ational-basis review . . . is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. [A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a classification cannot [be found unconstitutional] if there is a rational relationship between the [challenged government action] and some legitimate governmental purpose. . . . [A] classification must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

> [The government], moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. [T]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality.

509 U.S. 312, 319-20, 113 S. Ct. 2637, 125 L.Ed.2d 257 (1993) (emphasis added) (citations and internal quotation marks omitted); see Dittman v. California, 191 F.3d 1020, 1031 (9th Cir. 1999) ("It is . . . irrelevant for constitutional purposes whether, at the time the legislature acted, it articulated the 'conceivable basis' for the legislation.") (emphasis added). As the Ninth Circuit has held, a court applying rational-basis review "may even hypothesize the motivations of the state legislature to find a legitimate objective promoted by the provision under attack." Shaw v. Oregon Public Employees' Retirement Bd., 887 F.2d 947, 948-49 (9th Cir. 1989) (internal quotation marks omitted). Obviously, this imposes a "heavy burden" on the plaintiffs, Dittman, 191 F.3d at 1031; rational-basis analysis is, in short, "a paradigm of judicial restraint." FCC v. Beach Communications, Inc., 508 U.S. 307, 314, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993); see Kahawaiolaa v. Norton, 386 F.3d 1271, 1279 (9th Cir. 2004) (rational-basis standard is "highly deferential").

DOMA withstands review under this highly deferential standard. In light of society's still-evolving understanding of marriage, the statute adopted what amounted to a cautious policy of federal neutrality towards a new form of marriage. DOMA maintains federal policies that have long sought to promote the traditional and uniformly-recognized form of marriage, recognizes the right of each State to expand the traditional definition if it so chooses, but declines to obligate federal tax-payers in other States to subsidize a form of marriage their own States do not recognize. This policy of neutrality maximizes state autonomy and democratic self-governance in an area of traditional state concern, and preserves scarce government resources. It is thus entirely rational. Plaintiffs' contrary claim rests, at bottom, on an improper effort at constitutional bootstrapping: the fact that

some States have decided to expand the definition of marriage cannot create an equal protection-based duty in other States, or the federal government, to grant such recognition.

As Congress explained when enacting DOMA,"[t]here are relations of deep, abiding love" between persons of all kinds, "brothers and sisters, parents and children, grandparents and grandchildren," that "cannot be diminished as loves [just] because they are not . . . expressed in marriage." H.R. Rep. No. 104-664, at 13, reprinted in 1996 U.S.C.C.A.N. at 2917 (internal quotation marks omitted). But the sole relationship on the basis of which Congress and many States have long made certain benefits available is the legally recognized union of marriage between a man and a woman. In recent years, of course, some States have extended the same legal recognition, protections and benefits to same-sex marriages. Such recognitions, however, do not compel Congress to extend to this newly recognized form of marriage the same federal benefits it chose to afford to the centuries-old institution of heterosexual marriage. Instead, under rational basis scrutiny, Congress is entitled to adopt a cautious, wait-and-see approach to newer types of marriage and to society's still-evolving understandings of the institution. Legislatures may "refin[e] their preferred approach as circumstances change and as they develop a more-nuanced understanding of how best to proceed." Massachusetts v. EPA, 549 U.S. 497, 524, 127 S. Ct. 1438, 167 L.Ed.2d 248 (2007); see SEC v. Chenery Corp., 332 U.S. 194, 202, 67 S. Ct. 1575, 91 L.Ed. 1995 (1947) ("Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations."); Butler v. Apfel, 144 F.3d 622, 625 (9th Cir.1998) ("[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."); Medeiros v. Vincent, 431 F.3d 25, 31-32 (1st Cir. 2005) ("[A] statute or regulation is not lacking in a rational basis simply because it addresses a broader problem in small or incremental stages. It is only necessary that there be some rational relation between the method chosen and the intended result.") (citation omitted).

Section 3 of DOMA reflects just such an approach: it maximizes democratic flexibility and self-governance under our federalist system, by adopting a policy of federal neutrality with respect to a matter that is primarily the concern of state government. Because all 50 States recognize hetero-

sexual marriage, it was reasonable and rational for Congress to maintain its longstanding policy of fostering this traditional and universally-recognized form of marriage. At the same time, because Congress recognized both the freedom of States to expand the traditional definition, and the freedom of other States to decline to recognize this newer form of marriage, a policy of neutrality dictated that Congress not extend federal benefits to new forms of marriage recognized by some States. Given the strength of competing convictions on this still-evolving issue, Congress could reasonably decide that federal benefits funded by taxpayers throughout the nation should not be used to foster a form of marriage that only some States recognize, and that other States do not. See H.R. Rep. No. 104-664, at 16, reprinted in 1996 U.S.C.C.A.N. at 2920 (DOMA advances government's interest in "protecting state sovereignty and democratic self-governance."); The White House, Office of Communications, President on Signing Same Gender Marriage Ban, 1996 WL 533626 (Sept. 22, 1996) ("The Act confirms the right of each state to determine its own policy with respect to same gender marriage . . . .").

Although the Constitution does not require Congress to be so solicitous of divergent state policies and prerogatives, equal protection principles do not forbid such solicitude as irrational, particularly on matters of evolving and contentious social policy. See Mixon v. Ohio, 193 F.3d 389, 403 (6th Cir. 1999) ("State legislatures need the freedom to experiment with different techniques to advance public education and this need to experiment alone satisfies the rational basis test."); see also Barefoot v. City of Wilmington, 306 F.3d 113, 123 (4th Cir. 2002) ("[S]tates frequently have a variety of annexation procedures; the need to experiment to find the best procedure is itself a rational basis for the North Carolina law."); Moore v. Detroit School Reform Bd., 293 F.3d 352, 372 (6th Cir 2002) (holding that the Equal Protection Clause does not prohibit State and local "experimentation where no suspect classification or fundamental right is involved"); cf. Morton v. Mancari, 417 U.S. 535, 555, 94 S. Ct. 2474, 41 L.Ed.2d 290 (1974) (refusing to disturb, on equal protection grounds, a congressional judgment "rationally designed to further Indian self-government"); Artichoke Joe's Cal. Grand Casino v. Norton, 353 F.3d 712, 732-35 (9th Cir. 2003) (rejecting equal protection challenge to Tribal-State compacts that Congress adopted "to resolve the conflicting interests of the

tribes and the states, which it acknowledged as two equal sovereigns") (citation and internal quotation marks omitted); Newbury v. Prisoner Review Bd., 791 F.2d 81, 87 (7th Cir. 1986) (rejecting due process challenge to parole procedures, partly based on "the public interest in encouraging state experimentation in proper parole release procedures"). Indeed, when "[t]hroughout the Nation, Americans are engaged in an earnest and profound debate about the morality, legality, and practicality" of a particular social policy, it is entirely rational for Congress (and the courts) to "permit[ ] this debate to continue, as it should in a democratic society." Glucksberg, 521 U.S. at 751.

Thus, in order to adopt a measured response of federal neutrality, Congress had to draw lines and distinctions between different types of State-recognized marriage. The very process of line-drawing "inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." United States R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 179, 101 S. Ct. 453, 66 L.Ed.2d 368 (1980) (citation and internal quotation marks omitted). As the Ninth Circuit has observed, "[a] classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" Aleman v. Glickman, 217 F.3d 1191, 1201 (9th Cir. 2000) (quoting Dandridge, 397 U.S. at 485). Thus, "it is within the province of Congress, not the courts, to weigh the evidence and legislate on such issues, unless it can be established that the legislation is not rationally related to a legitimate governmental end." Kandu, 315 B.R. at 146 (emphasis added).

The constitutional propriety of Congress's decision to decline to extend federal benefits immediately to newly recognized types of marriages is bolstered by Congress's articulated interest in preserving the scarce resources of both the federal and State governments. DOMA ensures that evolving understandings of the institution of marriage at the State level do not place greater financial and administrative obligations on federal and state benefits programs. Preserving scarce government resources — and deciding to extend benefits incrementally — are well-recognized legitimate interests under rational-basis review. See Butler, 144 F.3d at 625 ("There is nothing irrational about Congress's stated goal of conserving social security resources, and Congress can incrementally

pursue that goal."); Hassan v. Wright, 45 F.3d 1063, 1069 (7th Cir. 1995) ("[P]rotecting the fisc provides a rational basis for Congress' line drawing in this instance."). Congress expressly relied on these interests in enacting DOMA:

> Government currently provides an array of material and other benefits to married couples in an effort to promote, protect, and prefer the institution of marriage. . . . If [a State] were to permit homosexuals to marry, these marital benefits would, absent some legislative response, presumably have to be made available to homosexual couples and surviving spouses of homosexual marriages on the same terms as they are now available to opposite-sex married couples and spouses. To deny federal recognition to same-sex marriages will thus preserve scarce government resources, surely a legitimate government purpose.

H.R. Rep. No. 104-664, at 18, reprinted in 1996 U.S.C.C.A.N. at 2922.

In the final analysis, plaintiffs contend that equal protection principles effectively precluded Congress from adopting a federal policy of neutrality in the face of evolving state understandings of marriage. On plaintiffs' view, even though Congress was under no independent constitutional obligation to recognize same-sex marriage before any State did so, once a single State legalized same-sex marriage, equal protection principles mandated that Congress extend federal benefits to such marriages, or withdraw them from all marriages. No constitutional principle, however, mandates such a result, which is fundamentally at odds with our federalist scheme of divided sovereignty, and which could be a substantial disincentive for States to recognize new rights and privileges as circumstances evolve.

VI. DOMA Does Not Violate the Right to Privacy

Plaintiffs also assert that DOMA constitutes "an undue invasion of the Right of Privacy," citing Griswold v. Connecticut, 381 U.S. 479, 85 S. Ct. 1678, 14 L.Ed.2d 510 (1965). See Complaint ¶¶ 17, 27, 28. This claim must fail, first, because the Supreme Court has rejected a "right to privacy" claim in relation to same-sex marriage. One of the arguments made in Baker v. Nelson, referred to above, was that Minnesota's refusal to permit same-sex marriage constituted "an unwarranted invasion of . . . privacy" in violation of the Constitution. See Jurisdictional Statement, Baker v. Nelson, No. 71-1027, at 18 (Attachment 2 hereto). In dismissing the appeal in Baker "for want of

a substantial federal question," the Supreme Court necessarily addressed the merits of that claim, and rejected it. 409 U.S. 810 (1972) (Mem); see Hicks v. Miranda, 422 U.S. at 343-44.

Even if Baker were not dispositive in this regard, this Court should reject plaintiffs' right-to-privacy claim. The Supreme Court has described the contours of this right as follows:

> The Constitution does not explicitly mention any right of privacy. In a line of decisions, however . . . the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution. . . . These decisions make it clear that only personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty," are included in this guarantee of personal privacy.

Roe v. Wade, 410 U.S. 113, 152, 93 S. Ct. 705, 35 L.Ed.2d 147 (1973) (citations omitted) (emphasis added); see Paul v. Davis, 424 U.S. 693, 712-13, 96 S. Ct. 1155, 47 L.Ed.2d 405 (1976). The Ninth Circuit has reiterated the underlined language. See Grummett v. Rushen, 779 F.2d 491, 493-94 (9th Cir. 1985). And this Court has observed more recently: "The federal constitutional right of privacy is extremely narrow. The right is limited to those personal rights which are 'fundamental' or 'implicit in the concept of ordered liberty.'" Yorkshire v. IRS, 829 F. Supp. 1198, 1202 (C.D. Cal. 1993) (emphasis added); accord Brown v. Hot, Sexy and Safer Productions, Inc., 68 F.3d 525, 532 (1st Cir. 1995); Shields v. Burge, 874 F.2d 1201, 1210 (7th Cir. 1989).

Under this precedent, plaintiffs cannot rely on a "right to privacy" to supersede DOMA, for as explained above, a "fundamental" right to same-sex marriage has not been recognized as such by the courts. See supra at 25-30; see also Smelt I, 374 F. Supp. 2d at 877-79; Wilson v. Ake, 354 F. Supp. 2d at 1306-07; Kandu, 315 B.R. at 140. Further, as also explained above, even if same-sex marriage had been acknowledged as a fundamental right, there would still be no "fundamental" right to receive federal benefits based on a gay or lesbian marriage, or to require other States to recognize such a marriage.

The Supreme Court's decision in Lawrence v. Texas does not support plaintiffs' right-to-privacy claim. Although the Court there relied in part on the right to privacy, the decision dealt with "private" conduct — an adjective that appears twenty-four times in the majority decision. 539 U.S. 558, 564-65 (2003). The Court struck down the subject statute because it "touch[ed] upon the most

private human conduct, sexual behavior, and in the most private of places, the home." That statute, the Court continued, sought "to control a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals. . . . [A]dults may choose to enter upon this relationship in the confines of their homes and their own private lives . . . ." Id. at 567 (emphasis added). Thus, the Court emphasized that the case before it did "not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." Id. at 578. Lawrence thus offers no support for the proposition that DOMA violates plaintiffs' right to privacy.

VII. DOMA Cannot Be Said to Infringe Upon any Rights of Speech

Plaintiffs next assert, without elaboration or any specific factual allegations, that DOMA violates their "Right of Free Speech." See Complaint ¶ 17. Apparently plaintiffs' theory is that their marriage constitutes "speech" under the First Amendment. This claim is groundless because, first, DOMA does not curtail anyone's right to marry the person of his or her choice, just as it does not affect an individual's right to travel or right to privacy. DOMA merely permits each State to follow its own policy with regard to same-sex marriage, and defines "marriage" and "spouse" for purposes of federal statutes. It does not affect the ability of any person to contract any marriage permitted by State law, and it cannot, for this reason alone, be said to infringe upon any speech rights related to same-sex marriage.

Even if DOMA could be seen as limiting one's ability to enter into a same-sex marriage, plaintiffs' "free speech" claim would fail because marriage, whether same-sex, or heterosexual, is not "expressive conduct" under the First Amendment. The Supreme Court has "rejected the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." See Rumsfeld v. Forum for Academic & Inst'l Rights, 547 U.S. 47, 65-66, 126 S. Ct. 1297, 164 L.Ed.2d 156 (2006) (internal quotation marks omitted). Rather, conduct may be considered speech under the First Amendment only if it is "inherently expressive" — that is, when it is "the equivalent of speech." See id. at 66; James v. City of Long Beach, 18 F. Supp. 2d 1078, 1082 (C.D. Cal. 1998).

In determining whether conduct falls within the First Amendment, the courts consider "whether an intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." See Texas v. Johnson, 491 U.S. 397, 404, 109 S. Ct. 2533, 105 L.Ed.2d 342 (1989) (internal quotation marks omitted)). The courts also examine whether the conduct in question is "integral to, or commonly associated with, expression," and whether "the challenged statute is directed narrowly and specifically at expression or conduct commonly associated with expression." See Roulette v. City of Seattle, 97 F.3d 300, 304, 305 (9th Cir. 1996) (internal quotation marks omitted).[11] Whether conduct is expressive must be judged based on the conduct alone, not in light of whatever speech may accompany it. See Forum for Academic & Inst'l Rights, 547 U.S. at 66. If it is "unclear" what message the actor intends to convey, it will not constitute expressive conduct. See Villegas v. City of Gilroy, 363 F. Supp. 2d 1207, 1217-18 (N.D. Cal. 2005). "The party asserting that [his] conduct is expressive bears the burden of demonstrating that the First Amendment applies, and that party must advance more than a mere 'plausible contention' that its conduct is expressive." Church of Amer. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 205 (2d Cir. 2004) (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 n.5, 104 S. Ct. 3065, 82 L.Ed.2d 221 (1984)).

Getting married or being married does not, under the circumstances presented here, constitute "expressive conduct" pursuant to these principles. Marrying is not "inherently expressive" or "commonly associated" with expression, and no "particularized message" is likely to be "understood" from the plaintiffs' being married.[12] See Forum for Academic & Inst'l Rights, 547 U.S.

---

[11] Thus, for example, picketing, burning a flag, wearing a black armband, or dancing for an audience may constitute "speech," see Texas v. Johnson, 491 U.S. at 404-06; Willis v. Town of Marshall, N.C., 426 F.3d 251, 257-61 (4th Cir. 2005), whereas attending a sports event, possessing a firearm, engaging in sexual activity in a commercial establishment, or dancing for one's own enjoyment (even in a public place) does not. See James v. City of Long Beach, 18 F. Supp. 2d at 1082-83; Nordyke v. King, 319 F.3d 1185, 1189-90 (9th Cir. 2003); Arcara v. Cloud Books, Inc., 478 U.S. 697, 705, 106 S. Ct. 3172, 92 L.Ed.2d 568 (1986); Willis, 426 F.3d at 257-61.

[12] Without any accompanying speech, an observer would not even know, for example, whether plaintiffs were expressing their feelings for each other, their views about same-sex marriage
(continued...)

at 66; Texas v. Johnson, 491 U.S. at 404; Roulette, 97 F.3d at 304. As this Court observed in relation to plaintiffs' First Amendment claim against the State statute in their earlier action, "[i]t is not readily apparent [that] obtaining a marriage license is protected First Amendment activity." Smelt I, 374 F. Supp. 2d at 867. Similarly, the Ninth Circuit noted, in affirming this Court's decision to abstain from deciding plaintiffs' State-law claim:

> We do not overlook Smelt and Hammer's claim that this case touches on First Amendment issues, which should dissuade us from abstention. . . . But it is difficult, or impossible, to see a true speech problem here . . . . All that is involved here is the failure to issue a marriage license.

Smelt II, 447 F.3d at 681 n.22; see Samuels v. New York State Dep't of Health, 811 N.Y.S.2d 136, 146-47 (N.Y. App. Div. 2006) (holding that State's prohibition of same-sex marriage did not violate constitutional free speech rights).

Therefore, DOMA does not violate any speech rights under the First Amendment.

## VIII. DOMA Cannot Be Said to Infringe Upon any "Right" under the Ninth Amendment

Finally, plaintiffs contend that DOMA violates what they call "the Ninth Amendment Right of Reservation of all Rights not Enumerated to the People." See Complaint ¶ 17. The Court of Appeals has repeatedly held, however, that the Ninth Amendment is not an independent source of rights; this provision of the Constitution "has not been interpreted as independently securing any constitutional rights for purposes of making out a constitutional violation." Schowengerdt v. United States, 944 F.2d 483, 490 (9th Cir. 1991).

"It is a common error, but an error nonetheless, to talk of 'ninth amendment rights.' The ninth amendment is not a source of rights as such; it is simply a rule about how to read the Constitution." San Diego County Gun Rights Comm. v. Reno, 98 F.3d 1121, 1125 (9th Cir. 1996) (quoting Laurence H. Tribe, American Constitutional Law 776 n.14 (2d ed. 1988)) (emphasis in original); accord Jenkins v. Commissioner, 483 F.3d 90, 92 (2d Cir. 2007) ("The Ninth Amendment

---

[12](...continued)
as a social matter, their views about the constitutionality of not permitting same-sex marriage, or their views on some other subject. See Villegas, 363 F. Supp. 2d at 1217-18 (rejecting "expressive conduct" claim where plaintiff's message was "unclear").

is not an independent source of individual rights; rather, it provides a 'rule of construction' . . . ."); Froehlich v. Wisconsin Dep't of Corrections, 196 F.3d 800, 801 (7th Cir. 1999) ("The Ninth Amendment is a rule of interpretation rather than a source of rights. Its purpose is to make clear that the enumeration of specific rights in the Bill of Rights is not intended . . . to deny the existence of unenumerated rights.") (citations omitted).[13] Thus, even more to the point in relation to this case, the Court of Appeals has specifically held that "the ninth amendment has never been recognized as independently securing any constitutional right, for purposes of pursuing a civil rights claim." Strandberg v. City of Helena, 791 F.2d 744, 748 (9th Cir. 1986).

Accordingly, plaintiffs cannot assert a personal "right" under the Ninth Amendment.

## CONCLUSION

For the foregoing reasons, the United States' motion to dismiss should be granted, and all of plaintiffs' claims against the United States should be dismissed with prejudice.

Dated: June 11, 2009

Respectfully submitted,

TONY WEST
Assistant Attorney General

JAMES J. GILLIGAN
Assistant Director

/s/ W. Scott Simpson

W. SCOTT SIMPSON
Senior Trial Counsel

Attorneys, Department of Justice
Federal Programs Branch

---

[13] But cf. United States v. Choate, 576 F.2d 165, 181 (9th Cir. 1978) ("Rights under the Ninth Amendment are only those 'so basic and fundamental and so deep-rooted in our society' to be truly 'essential rights,' and which nevertheless, cannot find direct support elsewhere in the Constitution.") (quoting Griswold v. Connecticut, 381 U.S. 479, 488-489 (Goldberg, J., concurring)). Even if this statement in Choate were the law, it would not help the plaintiffs here, given that, as shown above, same-sex marriage has not been recognized as a "fundamental" right.

Civil Division, Room 7210
Post Office Box 883
Washington, D.C. 20044
Telephone: (202) 514-3495
Fax: (202) 616-8470
E-mail: scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANT
UNITED STATES OF AMERICA

CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2009, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to each of the following:

James A Campbell
jcampbell@telladf.org

Andrew P Pugno
andrew@pugnolaw.com

Michael L Parker
michaelparker@sklaw.org
mlparker@socal.rr.com

Brian W Raum
braum@telladf.org
joshua@telladf.org
jhallock@telladf.org

I also certify that I have mailed the foregoing document to the following non-CM/ECF participant(s), on the date specified above:

Richard C Gilbert
Gilbert & Marlowe
950 West 17th Street Suite D & E
Santa Ana, CA 92706-3573

Mark R Beckington
CAAG - Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013

Sam Kim
Sam Kim and Associates PC
5661 Beach Blvd
Buena Park, CA 90621

/s/ W. Scott Simpson

W. SCOTT SIMPSON